## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| MICHAEL R. TURNER, | : | |
| | : | |
| Petitioner, | : | Case No. 2:07-cv-595 |
| | : | |
| -vs- | : | District Judge Michael R. Barrett |
| | : | Magistrate Judge Michael R. Merz |
| STUART HUDSON, Warden, | : | |
| | : | |
| Respondent. | : | |

## REPORT AND RECOMMENDATIONS

This matter is before the Court on Petitioner Michael Turner's petition for a writ of habeas corpus (Doc. No. 20).[1] Respondent filed his Return of Writ on November 1, 2007, (Doc. No. 25), and Turner's Reply was filed on February 8, 2008 (Doc. No. 32.) After an evidentiary hearing, the parties submitted their post-hearing briefs (Doc. Nos. 126, 129, 131). The matter is now ripe for decision.

Turner raises the following fourteen grounds for relief in his petition:

>     1.      Turner's statements to law enforcement officials were
>             not based on a knowing, voluntary and intelligent
>             waiver of his right against self-incrimination in

---

[1]Turner filed his initial petition on June 15, 2007 (Doc. No. 17), then filed a "substitute petition" on June 16, 2007 (Doc. No. 18), and ultimately filed an amended petition on July 31, 2007 (Doc. No. 20). Because the amended petition is comprehensive, and for the sake of clarity, the Court will refer to the amended Petition (Doc. No. 20) as "Petition" in its citation.

violation of the Fifth , Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

2.      The law enforcement officials who interrogated Turner failed to honor his clear and repeated requests for counsel and continued to interrogate him after he invoked his right to counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

3.      The trial court's failure to obtain a proper jury waiver and to conduct a proper guilty plea colloquy deprived Turner of due process of law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

4.      Michael Turner's jury waiver was not knowing, voluntary and intelligent and violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

5.      Michael Turner was deprived of a fair trial and due process by the trial court's failure to adhere to the Ohio Rules of Criminal Procedure at his plea hearing in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

6.      Michael Turner was denied the effective assistance of counsel in the innocence-guilt determination phase of his capital trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

7.      The death specification verdicts were not supported by sufficient evidence thereby depriving Turner of due process of law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

8.     The trial court violated Turner's constitutional rights by failing to merge duplicative aggravated circumstance [sic] for [the] purpose of the penalty phase weighing process in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

9.     Michael Turner was denied the effective assistance of counsel in the penalty phase of his capital trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

10.    The cumulative effects of the errors and omissions set forth in the preceding claims for relief prejudiced Turner and deprived him of his right to a fair trial and sentencing determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

11.    Turner's sentence of death was obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments as well as the various treaty and compact obligations of the United States under international law.

12.    Ohio has failed to provide an adequate system of appellate and proportionality review in death penalty cases.

13.    Michael Turner was denied the effective assistance of appellate counsel on his sole appeal of right to the Supreme Court of Ohio in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

14.    Ohio provided Turner an inadequate post-conviction remedy to permit Turner to fully and fairly vindicate his federal constitutional claims in the state courts under principles of comity and federalism.

(Doc. No. 20.)

## FACTS

The facts leading to Turner's convictions were summarized by the Ohio Supreme Court as follows:

> Turner's criminal history dates from 1980; while a felony suspect being transported by a deputy sheriff for a polygraph in Virginia, Turner attempted to kill the deputy sheriff with a letter opener. During the struggle, Turner jabbed at the deputy and also tried to grab the deputy's pistol. Turner pleaded guilty to attempted murder and received a 15-year prison term but served only five years before being paroled.
>
> Upon his release from prison, he managed to earn a living, but he violated parole and . . . [was] incarcerated [for another five years]. After a second release from prison, he divorced his first wife, Paula, and married Jennifer Lyles in January 2000 in Bassett, Virginia. Within months of their marriage, Turner began abusing his wife to the point that she fled to the homes of friends and neighbors. In September 2000, Jennifer left Virginia and moved to the Columbus[, Ohio] area at her mother's insistence to escape Turner's abuse. In December, she moved to her own apartment in Reynoldsburg. Later that month, Turner asked Jennifer for "another chance," and she allowed him to move in with her.
>
> On March 14, 2001, however, she filed a domestic-violence complaint against Turner after he hit her in the head during an argument. On April 5, 2001, she filed another complaint after he choked her to near unconsciousness. The next day, the court granted a temporary protection order ("TPO"), compelling Turner to move out of his wife's apartment.
>
> On May 5, 2001, police arrested Turner for violating the TPO. Angry with Jennifer because she had called police, Turner told

-4-

the arresting officers that "the war is on." On May 18, 2001, Turner pleaded guilty to misdemeanor domestic violence, and the court placed him on probation.

After the imposition of his probationary term, Turner began stalking Jennifer. She filed a complaint against Turner for telephone harassment on May 25, 2001 - charges that were still pending on the day of the murders. The next day, Turner told a co-worker at a Tim Hortons Restaurant that Jennifer had angered him by having him arrested and by filing the telephone-harassment complaint against him. Turner announced that he was going to "suit up and kill the bitch." Boasting that he was a "cop killer" by reenacting the 1980 attempted murder of the deputy in Virginia, he showed his co-worker a list of items that he called "No Prisoners," which included duct tape, a knife, rope, fuel, and matches, all necessary for his plan to, in Turner's words, "off the bitch."

Two days before the murder[s], Turner told a bartender: "I'm going to kill my wife. She took me to court for harassment. I'm going to off her. You watch me."

On the day of the murders, Turner gathered the necessary items for his plan. He bought two knives, and two hours later, he bought two gallons of gasoline.

On June 12, shortly after 10:00 p.m., Turner located Jennifer and her friend, Ronald Seggerman, at her apartment. Jennifer stayed inside while Seggerman grilled food outside. John Myers, Jennifer's neighbor, had been in his front yard and saw Seggerman pointing toward a parking lot located about 100 yards north of the apartment. Seggerman shouted, "[T]here he is," and went inside.

Seggerman came back outside armed with nunchaku[] and walked toward the parking lot, where Myers lost sight of him.

Myers then observed Turner forcing Seggerman to back up

-5-

toward Jennifer's apartment.  When they got to Myers's front yard, Myers saw Turner make several downward thrusts with a knife.  At 10:28 p.m., Myers called 911, stating, "[T]he guy is being stabbed to death.  I saw the knife and I saw him going down.  Get a cop here."

At 10:32 p.m., Jennifer Turner also made a 911 call.  The recording of this call reveals Jennifer's screams for help begging Turner to stop and Seggerman's plea with Turner, "Mike, you gotta stop."

Reynoldsburg police arrived at 10:34 p.m.  The first officer on the scene found Jennifer bleeding profusely from the neck with Seggerman lying next to her, face down in a pool of blood.  Medics were unable to find Seggerman's pulse rate or respiration.  Jennifer had "shallow respiration and a weak pulse."  Both underwent emergency surgery.

Jennifer Turner and Ronald Seggerman both died later that night of multiple stab wounds.  Autopsies showed that Jennifer had sustained . . . eleven stab wounds and Seggerman at least four, including one that punctured his lung.

Meanwhile, following the ambulance transport, police located Turner hiding in some trees near the parking lot at Jennifer's apartment.  He had blood on his face, arms, shirt, and shoes.  Near Turner's hiding place, police found a hunting knife, rope, chains, two locks, a hammer, and two one-gallon plastic jugs containing gasoline.  On June 13, police returned and found bloodstained gloves, a bloodstained fillet knife, and a sheath for a knife.

Also on June 13, detectives searched Michael Turner's apartment.  There they found a copy of Jennifer's May 5 complaint against Turner and a . . . list in Turner's [hand]writing that included "knives, rope, gloves, gas, lock and hammer."

-6-

Detectives interrogated Turner on the morning of June 13. Turner told them that he had been "standing there in the parking lot" when Seggerman "came across there with [he doesn't] know if it was a baseball bat or what it was." According to Turner, a jug of gasoline happened to be "sitting there," so he "ran towards [Seggerman] and threw it in his face." Turner then began to beat Seggerman, who dropped his "stick" in the parking lot. Turner admitted that he "probably" had a knife. He stated that Jennifer came outside and "jumped in the middle trying to break [them] up." Turner said, "I'm trying to push her away and she was . . . and I went, oh, fuck what did I do?" . . . He stated, "[I]t happened so quick I really had no control over it."

While in the custody in the Franklin Conty Jail, Turner told a fellow inmate that "he murdered his wife and her boyfriend; that he went over to talk to his wife and never expected her boyfriend to be there." He also told his cellmate that he had planned to kill Jennifer and commit suicide, but Seggerman "got in the way." Turner claimed that "he didn't mean to kill [Seggerman]" but admitted that "he did mean to kill Jennifer."

*State v. Turner*, 105 Ohio St. 3d 331, 331-33, 826 N.E.2d 266, 2005-Ohio-1938, ¶¶ 2-18 (2005).

Turner was indicted on two counts of aggravated murder with prior calculation and design. (Appendix, Vol. 1 at 15-17.) The first count included three specifications: (1) that Jennifer's murder was committed as part of a course of conduct involving the purposeful killing of two people, (2) that Turner had previously been convicted of an attempted murder, and (3) that Turner killed Jennifer to keep her from testifying in the domestic violence case then pending against him. *Id.* The second count in the indictment included two specifications: (1) that Turner killed Ronald Seggerman as part of a course of conduct

involving the killing of two people, and (2) that Turner had previously been convicted of an attempted murder.  *Id*.  Conviction of at least one of the specifications for either count would make Turner eligible for the death penalty.

After consultation with his counsel, Turner ultimately waived his right to a jury trial and pleaded guilty to both counts and all specifications in the indictment.  (Appendix, Vol. 2 at 125, 163-67.)  With a few exceptions not relevant here, Turner stipulated to the statement of facts submitted by the prosecution supporting the guilty pleas.  (Trial Tr., Vol. 2 at 38-9; Appendix, Vol. 11 at 26-34.)  The three-judge panel accepted Turner's guilty pleas on December 16, 2002.  (Trial Tr., Vol. 2 at 42.)  A mitigation hearing was held and on December 20, the panel unanimously found that the aggravating circumstances on each count outweighed the mitigating factors presented at the hearing, merged counts one and two, and sentenced Turner to death.  (Trial Tr., Vol. 2 at 220-21; Appendix, Vol. 3 at 8.)

## PROCEDURAL HISTORY

Turner filed a timely appeal in the Ohio Supreme Court, advancing seven propositions of law.  (Appendix, Vol. 3 at 52-90.)  The state supreme court overruled each and affirmed Turner's convictions and sentence of death on May 11, 2005.  *State v. Turner*, 105 Ohio St. 3d 331, 826 N.E.2d 266, 2005-Ohio-1938 (2005).

In September 2007, Turner filed an application to reopen his direct appeal, contending his appellate counsel were ineffective because they failed to present several

allegedly meritorious propositions of law to the Ohio Supreme Court. (Appendix, Vol. 4 at 1-10.) That application was denied on November 21, 2007, because Turner had failed to comply with the applicable 90-day filing deadline set forth in Ohio's Supreme Court Practice Rule XI(6)(A). *State v. Turner*, 116 Ohio St. 3d 1408, 876 N.E.2d 967, 2007-Ohio-6140 (2007)(table).

On October 20, 2003, Turner filed his petition for post-conviction relief, pleading seventeen claims,[2] and later added three more claims in a supplement. (Appendix, Vol. 5 at 15-68; Vol. 8 at 8-15.) The State filed a motion to dismiss Turner's petition without citation to any rule, which was granted by the trial court on September 22, 2004. (Appendix, Vol. 8 at 43-102, 375-84.) Turner appealed the trial court's decision, filing his initial brief in November 2004, and a brief corrected to conform to a state procedural rule the following month. (Appendix, Vol. 9 at 35-42, 122-71.) The court of appeals affirmed the trial court, *State v. Turner*, No. 04-AP-1143, 2006 WL 391820, 2006-Ohio-761 (Ohio App. 10 Dist. Feb. 21, 2006)(unreported), and the Ohio Supreme Court subsequently declined further appeal, *State v. Turner*, 110 Ohio St. 3d 1439, 852 N.E.2d 188, 2006-Ohio-3862 (2006)(table). The United States Supreme Court denied Turner's petition for a writ of

---

[2]In Turner's petition for post-conviction relief, he misidentifies the seventeenth claim as a second "Fifteenth Claim for Relief." (Appendix, Vol. 5 at 61, 67.) This Court will refer to the second of the "fifteenth grounds for relief" as the seventeenth claim. To add to the confusion, Turner's later supplement inexplicably numbered the additional claims as the eighteenth, seventeenth, and nineteenth grounds for relief. (Appendix, Vol. 8 at 8-15.) The Court renumbers those grounds for relief as the eighteenth, nineteenth, and twentieth claims, respectively, and will refer to them as such herein.

certiorari. *Turner v. Ohio*, 549 U.S. 1132 (2007).

## ANALYSIS

Since Turner filed his petition for a writ of habeas corpus well after the effective date

of the Anti-terrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, the

amendments to 28 U.S.C. § 2254 embodied in that Act are applicable to his petition. (*See*

Petition, Doc. No. 20.) The Sixth Circuit has summarized the standard of review under the

AEDPA as follows:

> Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) . . . , a federal court
>
> > may not grant a writ of habeas to a petitioner in state custody with respect to any claim adjudicated on the merits in state court unless (1) the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" . . . or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."
>
> *Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir.2002) (quoting 28 U.S.C. § 2254(d)).
>
> This standard requires the federal courts to give considerable deference to state-court decisions. *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir.1998) ("[the AEDPA] tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called unreasonable.") (citation and quotation marks omitted).
>
> The first line of analysis under [the] AEDPA involves the

-10-

> consistency of the state-court decision with existing federal
> law. A state-court decision is considered "contrary to . . .
> clearly established Federal law" if it is "diametrically different,
> opposite in character or nature, or mutually opposed."
> *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (emphasis and
> quotation marks omitted). Alternatively, to be found an
> "unreasonable application of . . . clearly established Federal
> law," the state-court decision must be "objectively
> unreasonable" and not simply erroneous or incorrect. *Id*. at
> 409-11.
>
> The second line of analysis under [the] AEDPA concerns
> findings of fact made by the state courts. [The] AEDPA
> requires federal courts to accord a high degree of deference to
> such factual determinations. "A federal court is to apply a
> presumption of correctness to state court findings of fact for
> habeas corpus purposes unless clear and convincing evidence
> is offered to rebut this presumption. The [federal] court gives
> complete deference to the . . . state court's findings of fact
> supported by the evidence." *McAdoo v. Elo*, 365 F.3d 487,
> 493-94 (6th Cir.2004) (citations omitted).

*Nields v. Bradshaw*, 482 F.3d 442, 449 (6th Cir. 2007)(parallel citations omitted). As the court

of appeals has stated, however, "federal courts need not review every point of error raised

by a *habeas* petitioner." *Hoffner v. Bradshaw*, 622 F.3d 487, 495 (6th Cir. 2010). The court

explained:

> When a "state prisoner has defaulted his federal claims in state
> court pursuant to an independent and adequate state
> procedural rule, federal habeas review of the claims is barred
> unless the prisoner can demonstrate cause for the default and
> actual prejudice . . . or demonstrate that failure to consider the
> claims will result in a fundamental miscarriage of justice."
> *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In this circuit, to
> determine whether a federal claim has been procedurally

-11-

defaulted, we apply the three-prong test initially laid out in
*Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986):

> First, the court must determine that there is a state
> procedural rule that is applicable to the petitioner's
> claim and that the petitioner failed to comply with the
> rule . . . .  Second, the court must decide whether the
> state courts actually enforced the state procedural
> sanction . . . .  Third, the court must decide whether
> the state procedural forfeiture is an "adequate and
> independent" state ground on which the state can rely
> to foreclose review of a federal constitutional claim . .
> . .
>
> *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001) (quoting *Maupin*,
> 785 F.2d at 138).  If the state procedural rule was not complied
> with and that rule was an "adequate and independent" ground
> for default, we may still excuse the default if the petitioner can
> demonstrate "that there was 'cause' for him not to follow the
> procedural rule and that he was actually prejudiced by the
> alleged constitutional error."  *Maupin*, 785 F.2d at 138.

*Hoffner*, 622 F.3d at 495 (parallel citations omitted).  It is with these principles in mind that

this Court considers the merits of Turner's fourteen grounds for relief.


**First Ground for Relief**

In his first ground for relief, Turner contends that his statements to the

Reynoldsburg police officers following his arrest were neither knowing, intelligent, nor

voluntary on account of his intoxication, need for "medication," and because he was

suffering the effects of withdrawal from alcohol and cocaine at the time of his interrogation.

(Petition, Doc. No. 20 at PAGEID 529-33.)   Respondent argues the claim is both

-12-

procedurally defaulted and meritless. (Return of Writ, Doc. No. 25 at PAGEID 730-37.)

Turner counters that Respondent has made only conclusory allegations in advancing the

affirmative defense of procedural default, thereby failing to meet the standard of *Maupin*

*v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). (Traverse, Doc. No. 32 at PAGEID 950-55.) Turner

states that he presented his claim to the state court as his first claim in his post-conviction

petition, and that the state court's application of the procedural rule of *res judicata* was

improper. *Id.* at PAGEID 953-54. He also argues that any procedural default of the claim

is attributable to the ineffectiveness of his appellate counsel. *Id.* at PAGEID 953.

    As Turner argues, he presented the instant claim to the state court in his petition for

post-conviction relief. (Appendix, Vol. 5 at 22-24.) The trial court dismissed the claim on

*res judicata* grounds (Appendix, Vol. 8 at 377), and the court of appeals affirmed on the

same ground, *State v. Turner*, No. 04-AP-1143, 2006 WL 391820 at *3, 2006-Ohio-761 at ¶ 14

(Ohio App. 10 Dist. Feb. 21, 2006)(unreported). Further appeal was declined by the Ohio

Supreme Court. *State v. Turner*, 110 Ohio St. 3d 1439, 852 N.E.2d 188, 2006-Ohio-3862

(2006)(table).

    In Ohio, error advanced on direct appeal must be apparent from the trial court

record; no supplementation of the record is permitted. Ohio R. App. Proc. 9(A), 16(A)(3).

Ohio's post-conviction relief process, on the other hand, requires reliance upon evidence

from outside the record. Ohio Rev. Code § 2953.21(C). Under Ohio's doctrine of *res*

*judicata*, claims that could have been raised on direct appeal but were not are barred from the court's consideration in post-conviction proceedings. *State v. Perry*, 10 Ohio St. 2d 175, 226 N.E.2d 104 (1967), paragraph nine of the syllabus.

Turner contends the state courts improperly concluded his claim could have been raised on direct appeal. He emphatically argues that the claim could not have been raised on direct appeal since it was supported by evidence outside the trial record, specifically, a psychological report prepared by Dr. Robert Smith after Turner was convicted and sentenced. Thus, Turner claims, raising the claim in post-conviction was his first opportunity to present and prove its merits to the state court.

The flaw in Turner's argument, however, is that he never attempts to establish that the substantive content of Dr. Smith's report could not have been prepared and presented at the time of Turner's trial, which is the crux of the state courts' rejection of his claim. In fact, in arguing cause and prejudice for the default, he asserts that the content of Dr. Smith's report *could* have been presented at the trial court level. (Traverse, Doc. No. 32 at PAGEID 954-55.)

That being the case, the state courts' reliance on the doctrine of *res judicata* to dispose of Turner's claim was proper. The Sixth Circuit Court of Appeals has found Ohio's doctrine of *res judicata* to be an independent and adequate state ground upon which a state may rely to reject a claim, *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002); *Coleman v.*

-14-

*Mitchell*, 268 F.3d 417, 427-29 (6th Cir. 2001), which results in procedural default of the claim in federal habeas corpus proceedings, unless cause for the default and prejudice therefrom is demonstrated, *Maupin*, 785 F.2d at 138.

Turner attempts to do just that by arguing his appellate and trial counsel's ineffectiveness should excuse any default. (Traverse, Doc. No. 32 at PAGEID 954-55.) Even if this Court were to accept Turner's argument that his trial counsel were ineffective for failing to develop and present evidence that Turner's statements to police were involuntary, and also his argument that appellate counsel were ineffective for failing to raise as error on direct appeal trial counsel's ineffectiveness, Turner cannot show prejudice resulting from his counsel's performance for the simple reason that he pled guilty to both counts of aggravated murder and their attendant aggravating circumstances. In this Court's consideration of Turner's ineffective assistance of appellate counsel claim, below, in fact, that is one of the reasons denial of that claim is recommended. *See* Thirteenth Ground for Relief, *infra*.

Turner's argument that his claim has been preserved for habeas corpus review, and in the alternative, that any procedural default should be attributed to attorney error and excused is unavailing. Accordingly, his first ground for relief is procedurally defaulted and should be denied.

Had Turner properly preserved the matter for this Court, however, it would still fail.

-15-

When Turner entered his guilty pleas to all counts and specifications, the prosecutor submitted a statement of facts supporting the plea to which Turner stipulated for the most part.[3]  (Appendix, Vol. 11 at 26-34; Trial Tr., Vol. 2 at 38-39.)  Turner did not dispute that he was facing a charge of telephone harassment of Jennifer at the time of the murders and that he had confided to a co-worker that he was angry at Jennifer for filing charges against him.  (Appendix, Vol. 11 at 27.)  He was also angry because he had been arrested for violating a temporary protection order previously issued against Turner on Jennifer's behalf.  *Id.*  Turner showed his co-worker a list of items he needed to "off the bitch," and told him he was going to "suit up and kill the bitch."  *Id.*  Two days before the murders, Turner also told a bartender of his plan to kill his wife in retaliation for Jennifer's having brought telephone harassment charges against him.  *Id.* at 28.  On the early afternoon of the murders, Turner purchased two knives at a K-Mart store.  *Id.*  Several hours later, Turner

---

[3]Turner's objections had to do with the characterization of several events or facts in his and Jennifer's past, and he had no objections to the facts relating to the murders as set forth in the statement of facts.  For instance, Turner acknowledged physically abusing Jennifer while the couple lived in Virginia, but denied psychologically abusing her, as claimed by the prosecutor in the statement of facts.  (Trial Tr., Vol. 2 at 38.)  Rather than leaving the marital home because of Turner's abuse as the prosecutor stated, Turner claimed Jennifer left to procure and use drugs.  *Id.*  Turner also denied that Jennifer's mother helped Jennifer move to Ohio to escape Turner's abuse, and contends instead that the move was somehow related to Jennifer's child support obligation in Virginia.  *Id.*  Turner further denied that he "discovered" Jennifer's Ohio address, insisting that the two had been exchanging love letters prior to his move to Ohio in December 2000.  *Id.*  He objected to the prosecutor's statement that Turner began physically abusing Jennifer "almost immediately" after the couple reconciled in Ohio, but acknowledged that domestic violence complaints were filed by Jennifer in March and April 2001.  *Id.* at 39.  Finally, Turner made the point that although the prosecutor's statement of facts indicates Turner was stalking Jennifer, "[n]othing was ever filed with regard to stalking," although there was a telephone harassment charge filed.  *Id.*  None of Turner's objections bear on his culpability for the murders of Jennifer and Seggerman.

was spotted by Ron Seggerman near the apartment he and Jennifer shared. *Id*. Turner agreed that Seggerman went into the apartment and emerged with nunchaku, an Okinawan martial arts weapon, and walked toward Turner. *Id*. He did not contest that there were two calls to emergency services at about that time: one in which a neighbor in the apartment complex called and told the dispatcher that a man was being stabbed to death in the parking lot, and a second from Jennifer herself which was not terminated until police arrived on the scene. *Id*. at 29. A recording of Jennifer's call was played and incorporated into the statement of facts presented by the prosecutor. *Id*. On that recording, Jennifer is heard identifying Turner by first and last name, and pleading with him to stop. (Appendix, Vol. 11 at 3-4.) Officers who arrived at the scene found Turner about one hundred yards away in some underbrush with both victims' blood on his face, arms, and shoes, which were nearby. *Id*. at 30, 32-33. Later, police recovered two knives from the bushes where Turner was found, and his fingerprints were found on one. *Id*. at 31, 33. The list of items Turner had shared with his co-worker detailing the items he intended to take with him when he went to "off the bitch" was found at Turner's apartment *Id*. at 30. Turner had no quarrel with the prosecutor's statement that Turner had confided to a fellow prisoner that he murdered Jennifer and Seggerman, that he planned Jennifer's murder, and that he meant to kill her. *Id*. at 33. Turner also acknowledged having been convicted of attempted murder in 1980. *Id*. at 33-34. To all of these events, Turner stipulated on

-17-

December 16, 2002, approximately one and a half years after the murders, at a time when he was neither intoxicated nor experiencing the symptoms of withdrawal from alcohol or cocaine.  (Trial Tr., Vol. 2 at 20-21.)  At that time, Turner acknowledged being on medication for an unspecified stomach condition and also that he was taking a mood stabilizing medication, but both he and his attorneys denied that either medication might affect his judgment with respect to pleading guilty to all charges and specifications.  *Id*. at 20-22.

Given the foregoing, even accepting Turner's assertions that he was intoxicated, suffering withdrawal from alcohol and cocaine, and denied required medication during his interrogation, *if* the state court had affirmed his convictions and sentence in the face of such evidence of guilt, and *if* Turner had properly preserved that issue for habeas corpus review, and *if* the state court's resolution of his claim were found by this Court to be contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, this Court would still recommend denial of Turner's first ground for relief because he has not demonstrated prejudice.  Turner's statements to police soon after his arrest are far less damning than the facts to which he stipulated in the course of his guilty pleas.  In fact, this Court is hard pressed to imagine what, if anything, might overcome the thoroughly overwhelming evidence of Turner's guilt for the murders of Jennifer and Seggerman, even without his statements to police or the admissions

incorporated into his guilty pleas.  Finally, the United States Supreme Court has held that "an intelligent and voluntary plea of guilty generally bars habeas review of claims relating to the deprivation of constitutional rights that occurred before the defendant pleaded guilty." *Haring v. Prosise*, 462 U.S. 306, 319-20 (1983), *citing Tollett v. Henderson*, 411 U.S. 258, 266 (1973).  Turner makes no argument as to why *Tollett* should not apply in his case, nor does he acknowledge its holding in any way.

Turner's first ground for relief has been procedurally defaulted, and his attempt to argue cause and prejudice for the default fails which leaves him with no excuse.  Had the claim been preserved for habeas review, however, it would also fail as Turner can demonstrate no prejudice from the claimed error.  Accordingly, Turner's first ground for relief should be denied as procedurally defaulted.

**Second Ground for Relief**

In his second ground for relief, Turner contends his repeated requests for counsel during his interrogation by the Reynoldsburg police officers were ignored in contradiction of his federal constitutional rights.  (Petition, Doc. No. 20 at PAGEID 534-38.)  Respondent argues the claim is both procedurally defaulted and meritless.  (Return of Writ, Doc. No. 25 at PAGEID 738-44.)  Turner again claims Respondent has not adequately proven procedural default, that he relied on evidence from outside the record in presenting the

claim to the state post-conviction court thereby preserving the claim and that ineffective

assistance of his counsel excuses any default.  (Traverse, Doc. No. 32 at PAGEID 959-68.)

It is true that Turner presented the instant claim to the state court in his petition for

post-conviction relief.  (Appendix, Vol. 5 at 25-26.)  It is also true that the state post-

conviction court denied the claim on *res judicata* grounds (Appendix, Vol. 8 at 377), the state

court of appeals affirmed the trial court on the same ground, *State v. Turner*, No. 04-AP-

1143, 2006 WL 391820 at *3, 2006-Ohio-761 at ¶¶ 12-14 (Ohio App. 10th Dist. Feb. 21, 2006)

(unreported), and the Ohio Supreme Court declined further review, *State v. Turner*, 110

Ohio St. 3d 1439, 852 N.E.2d 188, 2006-Ohio-3862 (2006) (table).  Turner makes the same

argument here as he did in his first ground for relief regarding his presentation of his claim

to the state courts.  Specifically, he argues that he submitted evidence outside the trial court

record, namely Dr. Smith's report, to support his claim in post-conviction.  (Traverse, Doc.

No. 32 at PAGEID 960-63.)  At the same time, he acknowledges that

> While the basic facts underlying the claim that the
> Reynoldsburg Police failed to honor Turner's clear and
> repeated requests for counsel by continuing to interrogate
> Turner after his repeated invocation of his right to counsel . . .
> were in the record . . . the police and jail records that clearly
> demonstrated Turner's extreme intoxication and symptoms of
> withdrawal were not.

(*Id*. at PAGEID 961.)  That sentence is a non sequitur, as Turner's alleged intoxication and

withdrawal symptoms have nothing to do with his requests for counsel or the police

officers' reaction to those requests.  This Court views Turner's claim that the police ignored his request for counsel as distinct from his claim that he was too inebriated to knowingly, intelligently, and voluntarily waive his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Furthermore, Turner's comments that he was "going to get me a lawyer," (Transcript of Statements to Police, Appendix, Vol. 5 at 181), "I'd like to have a lawyer help me with this," *id*. at 208, and "I think I need to talk to an attorney," *id*. at 210, were in the record and could have been presented to the trial court had Turner sought suppression of his statement.  His intoxication is irrelevant to the questions of whether Turner's statements were sufficient to invoke his right to counsel, and whether police responded appropriately.

Thus, the state courts could have resolved the issue of Turner's attempt to invoke his right to counsel without Dr. Smith's report at either the trial or appellate level.  Dr. Smith's opinion on Turner's ability to waive his *Miranda* rights prior to the interrogation was not necessary to resolve the issue, and as such, Turner's post-conviction claim did not rely on evidence from outside the record.  Simply put, that Turner relied on Dr. Smith's report in making his claim to the post-conviction court does not mean that the state court would have had to rely on it to render a decision in the matter.  Consequently, Turner's contention that his first opportunity to present the instant claim to the state courts came in his post-conviction proceedings fails, and the state courts' reliance on the doctrine of *res judicata* to dispense with the claim was proper.

As noted above, *res judicata* has been recognized by the Sixth Circuit Court of Appeals as an independent and adequate state ground which, when relied upon by a state court, results in procedural default of the asserted claim unless cause for the default and prejudice therefrom are demonstrated. Turner asserts the ineffectiveness of his trial and appellate counsel as cause for his default. Turner made the same argument in his first ground for relief. Because Turner's ineffective assistance of appellate counsel claim, considered in Turner's thirteenth ground for relief, *infra*, is without merit, it cannot serve as cause for his procedural default of the instant claim. Thus, Turner's procedural default of his second ground for relief is unexcused and his claim should be denied for that reason.

Had Turner preserved his claim for habeas corpus review, however, it would not warrant the extraordinary relief requested. It is not necessary to repeat all of the evidence against Turner that was discussed in the first ground for relief, but for the reasons stated there, Turner is unable to demonstrate prejudice from any error respecting his comments about talking with an attorney during his interrogation, and the police officers' handling of those comments.

Turner's second ground for relief is procedurally defaulted without excuse, and should be denied. Had it been preserved for habeas review, however, it would still fail as no prejudice from any constitutional infirmity has been demonstrated.

-22-

**Third and Fourth Grounds for Relief**

In his third and fourth grounds for relief, Turner contends that his waiver of a jury trial was improperly conducted and that the guilty plea colloquy was deficient, depriving him of his federal constitutional right to due process of law.[4] (Petition, Doc. No. 20 at PAGEID 539-47.) Respondent acknowledges the claims are preserved for habeas corpus review,[5] but argues they are nevertheless meritless. (Return of Writ, Doc. No. 25 at PAGEID 745-63; 757-63.)

**Jury Waiver**

Turner raised this claim as his second proposition of law on direct appeal to the Ohio Supreme Court. (Appendix, Vol. 3 at 65-68.) Turner's claim there, as here, was that he had not been informed prior to his waiver of a jury trial or his guilty pleas that one juror could prevent imposition of a death sentence, nor was he advised that the jury plays a critical role in determining a sentence in capital cases, or that he could withdraw his waiver at any time prior to trial. After thorough review, the state supreme court rejected Turner's claim relying on its prior rejection of the same jury waiver claim in another death penalty case and the guidelines for an adequate plea colloquy articulated in *United States v. Martin*,

---

[4]Turner's arguments here that his trial counsel failed to adequately inform him of the consequences of his jury waiver and guilty plea will be addressed in the Court's discussion of his sixth ground for relief, below, where he alleges trial counsel's ineffectiveness.

[5]Respondent does contend one paragraph in Turner's fourth ground for relief is procedurally defaulted (Return of Writ, Doc. No. 20 at PAGEID 545-6), but that paragraph argues trial counsel's ineffectiveness which is discussed under the sixth ground for relief.

704 F.2d 267 (6th Cir. 1983).  *State v. Turner*, 105 Ohio St. 3d 331, 334-36, 826 N.E.2d 266, 2005-Ohio-1938 at ¶¶ 22-35 (2005).

As the Ohio Supreme Court observed, in *Martin*, the Sixth Circuit Court of Appeals explained the requirements of a valid jury waiver as follows:

> [A] defendant ignorant of the nature of the jury trial right cannot intelligently weigh the value of the safeguard.  A defendant, therefore, should have both the mental ability and some knowledge of the jury trial right before he is allowed to waive it. . . .  A technical knowledge of the jury trial right, however, is not what is required. . . .  A defendant is sufficiently informed to make an intelligent waiver if he was aware that a jury is composed of [twelve] members of the community, he may participate in the selection of the jurors, the verdict of the jury must be unanimous, and that a judge alone [or in Turner's case, a panel of three judges whose verdict must be unanimous] will decide guilt or innocence should he waive his jury trial right. . . .  Knowledge of these essential attributes is generally sufficient to enable a defendant to make a knowing and intelligent decision.

*Martin*, 704 F.2d at 273 (citations omitted).  The Ohio Supreme Court found that "nothing in the record overcomes the presumption that Turner's written waiver [of a jury trial] was voluntary, knowing, and intelligent," and that Turner had failed to demonstrate that his waiver was not freely and intelligently made.  *Turner*, 105 Ohio St. 3d at 334-35, 2005-Ohio-1938 at ¶¶ 27-28.

Turner's burden under the AEDPA is to show that the state court applied federal law to his case in an objectively unreasonable manner.  *Bell v. Cone*, 535 U.S. 685, 698-99

(2002); *Durr v.Mitchell*, 487 F.3d 423, 435 (6th Cir. 2007).  Other than references to United States Supreme Court cases standing for the general proposition that a jury waiver must be knowing, intelligent, and voluntary, and that to meet that standard a defendant must have the mental ability and have "some knowledge" of the jury trial right before waiving the right (Petition, Doc. No. 20 at PAGEID 542; Traverse, Doc. No. 32 at PAGEID 973-75), Turner cites no federal law that might call the state court's decision on direct appeal into question in habeas corpus.  The only "argument" he makes that the state supreme court's decision on his jury waiver claim was contrary to federal law is his simple assertion that it is so.  (Traverse, Doc. No. 32 at PAGEID 976, 992.)  Turner fails to acknowledge or distinguish his circumstances from other Sixth Circuit Court of Appeals cases which observe that "[t]here is no constitutional requirement that a court conduct an on the record colloquy with the defendant prior to the jury trial waiver." *Sowell v. Bradshaw*, 372 F.3d 821, 832 (6th Cir. 2004), *citing Martin*, 704 F.2d at 274-75.

In *Cooey v. Coyle*, 289 F.3d 882 (6th Cir. 2002), the capital defendant's attorney informed the trial court that he had explained the waiver of a jury trial to his client, and that his client had discussed the matter with his father and others.  *Id*. at 914.  The court then asked the defendant if he understood that he had a right to a jury trial and if he had decided to waive that right voluntarily, to which the defendant answered affirmatively. *Id*.  The Sixth Circuit Court of Appeals found no constitutional error with the abbreviated

colloquy in the *Cooey* case.  *Id*.

In contrast, Turner acknowledged on the record in the trial court that he signed the written waiver, that he understood by signing the waiver he was giving up his right to a trial by a jury, that he had a constitutional right to such a trial, that he was waiving his right to have a jury of twelve people hear the evidence and return a unanimous verdict, that the alternative was to have a panel of three judges hear his capital case and decide all issues, that he consulted with his attorneys about the waiver, and that it was his desire to waive his jury trial.  (Trial Tr., Vol. 1 at 63-65.)  Thus, even though Turner had no federal constitutional right to a jury waiver colloquy at all, his far exceeded the colloquy found adequate in *Cooey*.  The state supreme court's conclusion that Turner's waiver was knowing, intelligent, and voluntary was neither contrary to nor an unreasonable application of clearly established federal law.  Accordingly, to the extent Turner claims his jury waiver was otherwise in his third and fourth grounds for relief, they should be denied.

Taking a cue, perhaps, from the state supreme court's reference to the absence of evidence supporting Turner's claim in the record, Turner also presented the jury waiver portion of the instant claims to the state courts again in his post-conviction proceedings.  (Appendix, Vol. 8 at 10-11.[6])  Turner submitted his own affidavit in support of his claim in

---

[6]Although Turner identifies his claim in post-conviction as his seventeenth claim contained in his amendment to his petition for post-conviction relief, that claim, which this Court notes is actually Turner's nineteenth claim (see footnote 2, above), is one of ineffective assistance of counsel.  (Appendix, Vol. 8 at 12-14.)

post-conviction.  (Appendix, Vol. 8 at 17-18.)  Nothing in the affidavit relates to the written

jury waiver or Turner's waiver of his right to a jury trial on the record in the trial court.

Instead, he states what his trial counsel did and did not tell him about his waiver of a jury

trial, and claimed that if they had explained all the consequences of his waiver, he would

have insisted on a jury trial.  *Id*.  Thus, while the affidavit might have had some relevance

to Turner's ineffective assistance of trial counsel claim in post-conviction, it had none to his

claim that the jury waiver was improperly conducted by the trial court.

The post-conviction court characterized Turner's affidavit as "self serving,"

concluded that Turner had not demonstrated entitlement to an evidentiary hearing on the

matter, and dismissed the claim.  (Appendix, Vol. 8 at 383.)  The court of appeals held that

the claim was barred in post-conviction by the doctrine of *res judicata*, and also observed

that because Turner's affidavit lacked credibility, the trial court did not err in dismissing

the claim without an evidentiary hearing.  *Turner*, 2006 WL 391820 at *4, 2006-Ohio-761 at

¶¶ 15-16.  The Ohio Supreme Court declined further review.  *Turner*, 110 Ohio St. 3d 1439,

2006-Ohio-3862.

Since the basis for Turner's claims of an invalid jury waiver was apparent on the

trial court record, those claims were properly raised on direct appeal and not in post-

conviction.  Thus, this Court need not apply the AEDPA to the post-conviction appellate

court's decision.  Were this Court to do so, however, it would find the claim procedurally

defaulted since the state court relied on an independent and adequate state procedural rule, *res judicata*, in dismissing the claim.  *Turner*, 2006 WL 391820 at *4, 2006-Ohio-761 at ¶¶ 15-16.

**Guilty Plea Colloquy**

Turner argues that the plea colloquy before the three-judge panel was inadequate to assure that his pleas were knowing, intelligent, and voluntary.  (Traverse, Doc. No. 32 at PAGEID 969.)  He presented his claim to the state supreme court as his first proposition of law on direct appeal.  (Appendix, Vol. 3 at 65-68.)  He did not present this sub-claim to the state court in his post-conviction proceedings.

It is beyond dispute that due process of law requires a guilty plea to be knowing and voluntary, meaning that the plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant."  *Parke v. Raley*, 506 U.S. 20, 28-29 (1992), *quoting North Carolina v. Alford*, 400 U.S. 25, 31 (1970), and *citing Boykin v. Alabama*, 395 U.S. 238, 242 (1969).  The reason for such caution is that a guilty plea involves a waiver of three constitutional rights:  (1) the right to a jury trial, (2) the right to confront one's accusers, and (3) the privilege against self-incrimination.  *Florida v. Nixon*, 543 U.S. 175, 187 (2004); *Parke*, 506 U.S. at 29, *citing Boykin*, 395 U.S. at 243.  Turner does not claim any defect in his guilty plea respecting the second and third of those rights, and basically argues the same error here as he did in the first part of the instant ground for relief having to do with

his waiver of a jury trial, specifically, that his pleas are invalid because he was not informed that a single juror could prevent imposition of a death sentence.  (Traverse, Doc. No. 32 at PAGEID 974.)

To support his claim, Turner cites *State v. Brooks*, 75 Ohio St. 3d 148, 162, 661 N.E.2d 1030 (1996), in which the Ohio Supreme Court observed that capital jurors in Ohio should be instructed that a solitary juror may prevent a death penalty recommendation.  A state court directive that a particular instruction should be provided to capital juries, however, is not the equivalent of a United States Supreme Court holding that such an instruction is constitutionally required, and has little relevance to a discussion about whether Turner's guilty pleas were knowing, intelligent, and voluntary.  Moreover, the United States Supreme Court has recently observed that *Brooks* does not state a federal constitutional imperative.  *Smith v. Spisak*, 130 S.Ct. 676, 684 (2010).

This Court is bound to respect the factual findings of the state trial and supreme courts concerning Turner's guilty pleas.  *Marshall v. Lonberger*, 459 U.S. 422, 435 (1983); 28 U.S.C. § 2254(e)(1).  As the state court observed on direct appeal, Turner was advised in the written plea he signed and in open court that by his plea, he was admitting guilt to the charges, waiving all defenses, the right to a trial by jury, the right to confront witnesses against him, the right to subpoena witnesses on his behalf, and the right to require the state to prove his guilt beyond a reasonable doubt.  *Turner*, 105 Ohio St. 3d at 335-36, 2005-Ohio-

-29-

1938 at ¶¶ 27-35.  He was also informed of the maximum penalty possible, questioned as to whether anyone had promised him anything in exchange for his plea, and as to whether he was taking any medication that might interfere with his judgment or his ability to understand the proceedings. *Id*. at ¶ 32.  By simply pointing out that he was not informed that a single juror could prevent a death sentence in his case Turner has failed to overcome the presumption of correctness due the state courts' findings that his guilty pleas were knowing, intelligent, and voluntary.

The Ohio Supreme Court's decision that neither Turner's waiver of a jury trial nor his guilty plea was constitutionally defective because he was not informed that a single juror could prevent a death sentence, that the jury plays an important part in capital sentencing, and that he could withdraw his jury waiver at any time prior to trial is consistent with rather than contrary to federal law, and Turner has failed to demonstrate by clear and convincing evidence that the state court's factual findings upon which its decision rests should not be entitled to the presumption of correctness dictated by 28 U.S.C. § 2254(e)(1).  Accordingly, he has not shown that habeas corpus relief is warranted, and his third and fourth grounds for relief should be denied.


**Fifth Ground for Relief**

In his fifth ground for relief, Turner contends that the trial court failed to examine

-30-

witnesses and hear evidence before making a determination as to his guilt in violation of

Ohio R. Crim. Proc. 11 and Ohio Rev. Code § 2945.06. (Petition, Doc. No. 20 at PAGEID

548-9.) Respondent acknowledges the claim is preserved for review, but argues it is a

matter of state law not cognizable in habeas corpus and meritless as well. (Return of Writ,

Doc. No. 25 at PAGEID 764-72.) Turner claims the state's violation of its own rule of

criminal procedure implicates the Fourteenth Amendment's Due Process Clause and that

violations of that constitutional provision are amenable to habeas corpus review pursuant

to *Evitts v. Lucey*, 469 U.S. 387 (1985). (Traverse, Doc. No. 32 at PAGEID 994-97.)

The parties agree that Turner presented the instant ground for relief to the state

court as his second proposition of law on direct appeal to the Ohio Supreme Court.

(Return of Writ, Doc. No. 25 at PAGEID 764; Traverse, Doc. No. 32 at PAGEID 994.) That

proposition of law was presented to the state court in its entirety as follows:

> THE TRIAL COURT FAILED TO ADHERE TO THE OHIO
> RULES OF CRIMINAL PROCDURE AT APPELLANT'S PLEA
> HEARING, THEREBY DEPRIVING HIM OF DUE PROCESS
> OF LAW AS REQUIRED [BY] THE FOURTEENTH
> AMENDMENT TO THE UNITED STATES CONSTITUTION
> AND ARTICLE ONE, SECTION TEN OF THE OHIO
> CONSTITUTION.
>
> As part of Appellant's plea hearing, the Assistant Prosecuting
> attorney representing the State read into the record a lengthy
> recital of facts which the State anticipated it would have
> proved at trial. Appellant asserts that this process violates this
> Court's holding in *State vs.* [sic] *Green* (1998), 81 Ohio St.3d 100.
> In *Green*, this Court stated: ". . . [W]e hold that when a

-31-

> defendant pleads guilty to aggravated murder in a capital case, a three-judge panel is required to examine witnesses and to hear any other evidence properly presented by the prosecution in order to make a Crim. R. 11 determination as to the guilt of the defendant." *Green* at 104-5. In the instant case, the three-judge panel heard only the prosecutor's statement of facts and nothing else in determining whether or not Appellant was guilty of aggravated murder or some other offense. Based on this Court's holding in *Green*, Appellant's convictions should be reversed and this case remanded to the Common Pleas Court of Franklin County for a new trial or other appropriate relief.

(Appendix, Vol. 3 at 69.) Although Turner made reference to the Fourteenth Amendment's Due Process Clause in the caption of his proposition of law, his argument is based exclusively upon state law. Similarly, the state supreme court relied only state law in rejecting Turner's claim, and cited no federal law at all. *Turner*, 105 Ohio St. 3d at 337-38, 2005-Ohio-1938 at ¶¶ 37-42. Including a bare reference to a federal constitutional provision, without more, is not enough to fairly present a claim to a state court because it is "simply too vague to count as fair presentation" and because it does not set forth the "specific legal and factual basis for the claim." *Wagner v. Smith*, 581 F.3d 410, 415-16 (6th Cir. 2009). The Sixth Circuit Court of Appeals explained in *Wagner* that habeas corpus petitioners are "not required to state with exact specificity the factual nature of their claim in every heading of every [state court] brief," but noted that a petitioner may not rely on a heading that merely mentions a federal constitutional provision and provides no factual basis for that specific claim. *Id*. at 416. "A lawyer need not develop a constitutional argument at

length, but he must make one; the words 'due process' are not an argument." *Riggins v. McGinnis*, 50 F.3d 492, 494 (7th Cir. 1995).

Thus, it appears that although the parties agree that Turner raised his federal claim in the state court, a colorable argument could be made that he did not. Regardless, Respondent has not advanced a procedural default defense, which in fact waives it and requires this Court to address Turner's claim *de novo*. "If deference to the state court is inapplicable . . ., we 'exercise our independent judgment' and review the claim *de novo*." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003), *quoting Hain v. Gibson*, 287 F.3d 1224, 1229 (10th Cir. 2002).

Turner argues that Ohio law requires a three-judge panel taking a guilty plea from a capital defendant to "examine the witnesses, determine whether the accused is guilty of aggravated murder of any other offense, and pronounce sentence accordingly." (Petition, Doc. No. 20 at PAGEID 548; Traverse, Doc. No. 32 at PAGEID 994-95.) He contends that the prosecutor's statement of facts, to which Turner stipulated with few exceptions noted above, did not constitute evidence upon which the three-judge panel could fulfill their duty under Ohio law. (Traverse, Doc. No. 32 at PAGEID 995.) Turner argues that the state's violation of its own law deprived him of the due process of law to which he is entitled under the Fourteenth Amendment. (Petition, Doc. No. 20 at PAGEID 548-9; Traverse, Doc. No. 32 at PAGEID 994-997.)

Turner fails to acknowledge or address the substantial body of law that contradicts

his position, and instead places all his eggs in the *Evitts v. Lucey*, 469 U.S. 387 (1985), basket. There, the United States Supreme Court held that "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution – and, in particular, in accord with the Due Process Clause." *Id*. at 401. Turner contends that the state's enactment of the law requiring the three-judge panel to take evidence in cases in which a capital defendant has pleaded guilty created a federal due process right that was violated in his case. Ohio law, however, accepts stipulated facts proving all elements of the offenses and stipulations charged as binding and enforceable in the context of a guilty plea. *State v. Post*, 32 Ohio St. 3d 380, 393, 513 N.E.2d 754 (1987). Even if that were not the case, if a guilty plea isvalid under the federal constitution when the defendant actually asserts his innocence and admits that he is pleading guilty in hopes of a lenient sentence at the plea hearing, as was the case in *North Carolina v. Alford*, 400 U.S. 25 (1970), surely no deprivation of due process occurs when the defendant admits guilt and stipulates to facts sufficient to satisfy all elements of the offenses and specifications. *See Henning v. Prelesnik*, No. 1:07-cv-534, 2010 WL 1744864 at *7 (W.D. Mich. Apr. 6, 2010) (Report and Recommendations), *adopted by Henning v. Prelesnik*, 2010 WL 1744862 (W.D. Mich. Apr. 28, 2010)(Order Approving Report and Recommendations) (stating "the adequacy of the factual basis for Petitioner's guilty plea . . . is [not] reviewable in habeas corpus"). "By pleading guilty, it is well established a

-34-

defendant forfeits a host of constitutional rights, including his right . . . to have every element of his offense proven beyond a reasonable doubt." *United States v. Leachman*, 309 F.3d 377, 384 (6th Cir. 2002), *citing Boykin v. Alabama*, 395 U.S. 238, 243 (1969), and *Neely v. Pennsylvania*, 411 US. 954, 957 (1973)(Douglas, J., joined by Stewart, J., and Marshall, J, dissenting from denial of a petition for a writ of certiorari)(memorandum).

Here, Turner's complaint is not that he was found guilty of the offenses and specifications on inadequate evidence, or that he did not understand precisely to what offenses he was pleading guilty, but rather that he entered his pleas in hopes of receiving a sentence less severe than death.  (Traverse, Doc. No. 32 at PAGEID 995.)  The United States Constitution, however, does not guarantee fulfillment of a capital defendant's hopes, and Turner cites no Supreme Court law that comes close to supporting his claim that he was entitled to more due process than he received in the trial court.  During his hearing, Turner acknowledged that he understood he was eligible for death sentences on both counts of aggravated murder, and he stated that no one had promised him a more lenient sentence as an inducement to get him to plead guilty to all counts and specifications.  (Trial Tr., Vol. 2 at 16, 18.)  Thus, Turner's assertion that he pled guilty with the expectation of avoiding a death sentence is contradicted by the record.  Finally, Turner has demonstrated no prejudice from the constitutional error he claims since there is not even a minuscule likelihood that he would have been found not guilty of either aggravated murder count or

any of the aggravating circumstances had the trial court engaged in the taking of evidence Turner argues is mandated by state law.

Turner has not stated a claim cognizable in habeas corpus, and his fifth ground for relief should accordingly be denied.

**Sixth Ground for Relief**

In his sixth ground for relief, Turner contends he was deprived of the effective assistance of trial counsel in the penalty phase of his trial because his counsel (1) failed to move to suppress his statements to police; (2) failed to move to suppress his statements because the interrogating officers ignored his request for counsel; (3) failed to ensure that he could withdraw his guilty pleas should he receive a death sentence; and (4) failed to inform Turner of the consequences of his jury waiver. (Petition, Doc. No. 20 at PAGEID 74.) Respondent asserts that some of Turner's sub-claims are procedurally defaulted and all are meritless. (Return of Writ, Doc. No. 25 at PAGEID 773-91.)

The law governing Turner's ineffective assistance of counsel claims is embodied in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which holds that

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by

the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

The Court is mindful of these precepts in considering each of Turner's ineffective assistance of trial counsel grounds for relief.

**First and Second Sub-Claims - Failure to Move to Suppress Statements to Police**

Turner presented his claim that his counsel were ineffective because they failed to move to suppress his statements to police in his post-conviction petition as his fifteenth and sixteenth claims for relief. (Appendix, Vol. 5 at 61-66.) Turner first argues he was too intoxicated to voluntarily waive his right to remain silent during his interrogation and that his statements should have been suppressed on that basis. *See* First Ground for Relief, *supra*. The state trial court found Turner's claim barred by the doctrine of *res judicata*, and in the alternative stated that "a counseled plea of guilty is an admission of factual guilt so reliable that, where voluntary and intelligent, it quite validly removes the issue of factual guilt from the case" and dismissed the claim. (Appendix, Vol. 8 at 377 (internal quotation marks omitted).) On appeal from that decision, the court of appeals ignored the procedural bar relied upon by the trial court and found that even if trial counsel's ineffectiveness were assumed, Turner's showing of prejudice was "pure speculation." *Turner*, 2006 WL 391820

at *10, 2006-Ohio-761 at ¶ 37.  The Ohio Supreme Court declined further review.  *Turner*,

110 Ohio St. 3d 1439, 2006-Ohio-3862.  Thus, although the trial court enforced the state

procedural rule barring Turner's claim from consideration, the court of appeals' merits

decision negated the procedural bar and preserved the claim for habeas corpus review.

Turner also contends his trial counsel should have moved for suppression of his

statements to police made after he invoked his right to counsel during his interrogation.

(Petition, Doc. No. 20 at PAGEID 554-58.)  Respondent argues that trial counsel had good

reason for not seeking suppression of Turner's statements because those statements were

the only evidence counsel would have had available to present Turner's claims of self

defense in the case of Seggerman's murder, and accident in the case of Jennifer's murder,

without Turner's taking the witness stand and subjecting himself to cross-examination had

his case gone to trial.  (Return of Writ, Doc. No. 25 at PAGEID 784-5.)  Turner counters that

Respondent's argument is speculative and unsupported by any evidence in the record as

to counsel's motivation in not moving to suppress Turner's statements to police.  (Traverse,

Doc. No. 32 at PAGEID 1008.)  He contends that the prosecution side of any aggravated

murder case is strengthened by the defendant's inculpatory statements regardless of the

strength of the other evidence against him.  *Id*.  Although the instant ground for relief

alleges trial counsel's ineffectiveness in the guilt phase of Turner's trial, he also argues

prejudice from counsel's errors affected the penalty phase as well.  *Id*. at PAGEID 1009-10.

In his Traverse, Turner disputes the state appellate court's conclusion that he was not prejudiced by his counsel's failure to move for suppression of his statements to police. (Doc. No. 32 at PAGEID 1011.)  He argues that his statements "clearly affected every aspect of this prosecution, including the decisions to waive a jury [and] to enter a plea of guilty . . . ." *Id.* He further contends that "any aggravated murder case is significantly weakened by suppressing . . . inculpatory statements." *Id.*

In *Hill v. Lockhart*, 474 U.S. 52 (1985), the United States Supreme Court held that a claim of ineffective assistance of trial counsel in a case where a guilty plea was entered, the second prong of *Strickland*, the prejudice requirement, places on a habeas petitioner the burden of showing "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59.  This, Turner has not done.

On December 2, this Court granted in part and denied in part Turner's Motion for an Evidentiary Hearing (Doc. No. 93).  In that Order, the Court allowed Turner to present Adam and Edward Turner, Larry Hancock, Paula Cox, Brandi Fox, J. Tullis Rogers, Blaise Baker, Tonda Meadows, Kristin Haskins, Edward Morgan, Christian Domis, Dr. Robert Smith, and, conditionally, Todd W. Barstow, W. Joseph Edwards.  Various permutations attended the holding of that hearing and Respondent also designated witnesses to testify. The hearing was eventually held February 1-3, 2010.

-39-

In granting the evidentiary hearing in this case, the Magistrate Judge proceeded on a reading of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA") which has now been held to be erroneous in *Cullen v. Pinholster*, 563 U.S. ___, 2011 U.S. LEXIS 2616 (Apr. 4, 2011).  In the analysis that follows, none of the evidence presented at the evidentiary hearing is relied upon to determine that the state courts' rulings on any federal constitutional claim were contrary to or an unreasonable application of clearly established federal law, a process prohibited by *Cullen*.  The Magistrate Judge does not understand *Cullen* to prohibit reliance on such evidence, taken before *Cullen* was decided, for other purposes.  In any event, the holding of the evidentiary hearing was not prejudicial to Respondent because this Report ultimately recommends denial of the writ.

Lead counsel representing Turner at trial testified at the evidentiary hearing in these proceedings that he doubted filing a motion to suppress Turner's statements to police would have benefitted Turner given the other evidence in the case, although he acknowledged that he probably should have filed the motion since it was "standard operating procedure." (Evid. Hrg. Tr., Testimony of James Tullis Rogers, Doc. No. 123, Vol. 1 at 104.)  Even if Turner's statements had been suppressed, Rogers testified that he did not think Turner would have been acquitted.  *Id*. at 136.  Rogers' co-counsel, Blaise Baker, testified at the evidentiary hearing that the defense would have filed a motion to suppress

-40-

Turner's statements to police if the case had gone to trial.  (Evid. Hrg. Tr., Vol. 2 at 446.)

Most significantly, however, is the fact that nearly one and a half years after the murders, Turner pled guilty and stipulated to all the facts discussed in this Court's consideration of Turner's first ground for relief.  Turner was neither intoxicated nor suffering any withdrawal symptoms at that time, and he acknowledged that he was voluntarily pleading guilty to all counts and specifications.  (Trial Tr., Vol. 2 at 20-22.)  The only "evidence" supporting Turner's argument that, had his statements to police been suppressed, he would not have pled guilty to the aggravated murders and specifications is his own affidavit appended to his state post-conviction petition, which is entitled to little weight because it is both self-serving and uncross-examined.  (*See* Appendix, Vol. 9 at 16-17.)

Thus, even assuming, as the state appellate court did, that Turner's trial counsel erred in failing to move for suppression of Turner's statements to police, Turner has not satisfied the prejudice prong of *Strickland*.  He offers no evidence that a motion would have had a reasonable probability of succeeding, or that there is a reasonable probability that the outcome of his trial would have been different had his statements to police been suppressed.  Moreover, his guilty plea and stipulation to the facts supporting his plea negate any prejudice he might have demonstrated from his attorneys' failure to move for suppression of his statements to police.  *See Haring*, 462 U.S. at 319-21; *Tollett*, 411 U.S. at

-41-

266.

Finally, the evidence of Turner's guilt even without his statements to police was unquestionably overwhelming, as has been discussed in this Court's consideration of Turner's first ground for relief, *supra*.  While this Court does not doubt that inculpatory statements made by a suspect are generally considered to be some of the most powerful evidence of guilt available, that is not so in Turner's case.  Turner's bragging to more than one person that he was going to kill Jennifer, his list of items he would need to accomplish his goal, an eyewitness to Seggerman's murder, an actual recording of Turner's murdering Seggerman and Jennifer, their blood on his person, and his having been found just a short distance from his victims' bodies combine to render whatever inculpatory statements he made to the police insignificant by comparison.

Turner has not demonstrated that he suffered any prejudice from his counsel's failure to move to suppress his statements, and the state court's decision finding the same was neither contrary to nor an unreasonable application of federal law.  Accordingly, Turner's first and second sub-claims of his sixth ground for relief should be denied as meritless.

### Third and Fifth Sub-Claims - Failure to Ensure Turner Could Withdraw His Waiver of a Jury Trial and Plea

In his third and fifth sub-claims in his sixth ground for relief, Turner alleges his trial counsel were ineffective because they did not ensure that he could withdraw his waiver

of a jury trial and his guilty pleas in the event that the three-judge panel returned a verdict of death in his case.  (Petition, Doc. No. 20 at PAGEID 558-63, 567-74.)  The first of these sub-claims is subsumed by the second since "[b]y entering a guilty plea, a defendant waives constitutional rights that inhere in a criminal trial, including the right to trial by jury." *Florida v. Nixon*, 543 U.S. 175, 187 (2004), *citing Boykin v. Alabama*, 395 U.S. 238, 243 (1969).  Respondent argues the issue is procedurally defaulted without excuse and meritless as well.  (Return of Writ, Doc. No. 25 at PAGEID 774-7, 786-89.)  Turner counters that the state trial and appellate courts' findings that his claim was barred by the doctrine of *res judicata* was a misapplication of the state procedural rule, and that he also preserved the matter for habeas review by raising it in his application to reopen his direct appeal. (Traverse, Doc. No. 32 at PAGEID 1012-17.)

Turner presented the plea withdrawal issue to the state court in his petition for post-conviction relief.  (Appendix, Vol. 5 at 27-32.)  The trial court dismissed Turner's claim as both lacking in foundation and barred by the doctrine of *res judicata*.  (Appendix, Vol. 8 at 378.)  The court of appeals found that even though Turner presented evidence outside the record to support his claim, "there is no reason why appellant could not have raised these claims based upon information in the original trial record." *Turner*, 2006 WL 391820 at *5, 2006-Ohio-761 at ¶ 22.  The Ohio Supreme Court denied further appeal. *Turner*, 110 Ohio St. 3d 1439, 2006-Ohio-3862.

Turner takes issue with the state court's determination that he could have presented his claim on direct appeal. (Traverse, Doc. No. 32 at PAGEID 1013-16.) Turner's argument in the state court is the same one he advances here regarding his alleged right to withdraw his guilty plea. He argues that at the time of his trial, it was the practice in Franklin County, Ohio, to allow capital defendants to withdraw their guilty plea if the three-judge panel returned a sentencing verdict of death. (Appendix, Vol. 5 at 28, 31; Petition, Doc. No. 20 at PAGEID 561-62, 571-72.) Demonstrating attorney error in counsel's failure to reserve Turner's right to withdraw his guilty plea, then, would necessarily require resort to evidence outside the trial record, to wit, evidence of the existence of a practice of allowing withdrawal of guilty pleas where death verdicts are returned by three-judge panels. Turner submitted what he purports to be such evidence with his petition for post-conviction relief in the state court. (*See* Appendix, Vol 5 at 73-74; Vol. 6 at 2-144.) Turner contends that because his post-conviction claims relied on evidence outside the record, it could not have been presented on direct appeal, and that the court of appeals' decision to the contrary was an erroneous application of the state procedural rule. (Traverse, Doc. No. 32 at PAGEID 1014-16.)

Ordinarily, when a state court relies upon an independent and adequate state procedural rule in rejecting a claim in direct appeal, post-conviction proceedings, or in an application to reopen a direct appeal, the claim is procedurally defaulted for federal habeas

corpus purposes. *See Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986). In *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001), however, the Sixth Circuit Court of Appeals concluded that "when the record reveals that the state court's reliance upon its own rule of procedural default is misplaced, we are reluctant to conclude categorically that federal habeas review of the purportedly defaulted claim is precluded." *Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005). When such circumstances arise, the district court is permitted to conduct *de novo* review on the merits of the claim. *Id.* Thus, since Turner's plea withdrawal claim could not have been resolved without resort to evidence outside the record, the state court of appeals' reliance on the doctrine of *res judicata* in Turner's post-conviction proceedings was improper, and this Court is not prevented from addressing the claim here.

Turner's claim is nevertheless unavailing. The materials he submitted to support his claim in his post-conviction proceedings are either not competent, or are clearly distinguishable from his circumstances. For instance, he cited Brandie Fox's affidavit in support of his claim in the state court. (Appendix, Vol. 5 at 26, 73-74.) Nothing in her affidavit is relevant to Turner's claim that his counsel should have ensured that he would be able to withdraw his guilty plea should the panel return a death verdict. In addition, he cited the transcripts of his interrogation by police, which is similarly irrelevant to his claim of ineffective assistance of counsel respecting his ability to withdraw his plea. (Appendix, Vol. 5 at 26, 145-225.) He also cited what appears to be a portion of an appellate

brief in a different case in which the appellant claimed his counsel were ineffective for failing to request a change of venue, and a decision and entry in that same case. (Appendix, Vol. 5 at 29, 324-331.) Turner does not explain the significance of those documents, and this Court finds none.

Next, Turner referenced the 1990 affidavit of an attorney who states that "the jury trial right should never be waived without reservation of the option to withdraw the waiver in the event that the three-judge panel returns a death sentence." (Appendix, Vol. 5 at 336.) The state court was not wrong to discount that affidavit as evidence, *Turner*, 2006 WL 391820 at *5, 2006-Ohio-761 at ¶ 22, since it was at the time Turner presented it to the court nearly thirteen years old, and uncross-examined as well. In addition, as any attorney knows, what one lawyer thinks the law *should* be does not the law establish.

Turner also directed the state court to another 1990 affidavit of a different attorney who indicated that where a capital defendant waives a jury trial and enters a plea agreement, the agreement should provide for withdrawal of the jury trial waiver should the agreement be unacceptable to the three-judge panel following the presentation of mitigation evidence. (Appendix, Vol. 5 at 29; Vol. 6 at 2.) Finally, Turner attached a written guilty plea, and the transcript of a plea hearing, guilty verdict, mitigation hearing, and sentencing verdict by a three-judge panel in the 2003 capital case of defendant Shaquale Woodhouse. (Appendix, Vol. 6 at 3-146.) In that case, Woodhouse entered a plea

agreement in which he pled guilty to one count of aggravated murder and one capital specification in exchange for a sentence of life without parole. *Id*. But Turner had no plea agreement, and thus no guarantee or even reasonable expectation that the death penalty was not one of the options available to the three-judge panel. In fact, in his plea hearing, he was advised that both counts of aggravated murder to which he pled guilty carried a possible sentence of death, (Trial Tr., Vol. 2 at 10), and Turner acknowledged that he understood he could be sentenced to death, *id*. at 16, 19. Consequently, the second attorney affidavit and the materials from the Woodhouse case do not support Turner's claim that his attorneys should have somehow ensured that he could withdraw his guilty plea after the death verdict was returned by the three-judge panel in the absence of a plea agreement.

Any remaining doubt that such a practice existed in Franklin County at the time of Turner's trial was dispelled by the evidentiary hearing testimony of Christian Domis and Edward Morgan, Turner's trial prosecutors. Domis testified that he had never heard of the practice, and even questioned whether it would be legal to allow a defendant sentenced to death to withdraw his guilty plea. (Evid. Hrg. Tr. at 394-5.) Likewise, Morgan testified that a practice allowing withdrawal of a guilty plea after sentencing was "discussed all the time among prosecutors and defense attorneys," but that he was "not aware it was ever done." (Evid. Hrg. Tr. at 427.) In addition, he would never have approved such an arrangement in Turner's case specifically. *Id*. Thus, even if such a practice were established in Franklin

-47-

County at the time of Turner's trial, he would not have benefitted from it.

Furthermore, Domis' questioning of the propriety of conditioning the finality of a guilty plea on the sentence imposed, absent a plea agreement that is, was legitimate. Ohio law provides that "[a] motion to withdraw a plea of guilty or no contest may be made only before sentence is imposed; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his or her plea." Ohio R. Crim. Proc. 32.1. A "manifest injustice" has been defined by the Ohio Supreme Court as "a clear or openly unjust act." *State ex rel. Schneider v. Kreiner*, 83 Ohio St. 3d 203, 208, 699 N.E.2d 83 (1998), *citing* Webster's Third New International Dictionary (1986) 1164, 1375. The state supreme court has recognized that the term "manifest injustice" has been "variously defined," but explained that the standard allows a post-sentence withdrawal of a plea only in extraordinary case. *State v. Smith*, 49 Ohio St. 2d 261, 264, 361 N.E.2d 1324 (1977), *citing United States v. Semel*, 347 F.2d 228, 229 (4th Cir. 1965.) Tellingly, the state court specifically observed that "[t]he standard rests upon practical considerations important to the proper administration of justice, and seeks to *avoid the possibility of a defendant pleading guilty to test the weight of potential punishment*." *Smith*, 49 Ohio St. 2d at 264, *citing Kadwell v. United States*, 315 F.2d 667, 670 (9th Cir. 1963) (emphasis added). One can easily draw the conclusion that the Ohio Supreme Court has interpreted Ohio R. Crim. P. 32.1 as one designed to prevent the very thing Turner claims his lawyers

should have secured for him.

Turner points to no law supporting his claim that he was entitled to withdraw his guilty plea after receiving a sentence of death, and the record is completely devoid of any suggestion that Turner failed to comprehend the possibility of a death verdict.  Instead, he provides two out-of-date and uncross-examined affidavits from attorneys and part of the record of a capital case in which a plea agreement specified a life sentence which is distinguishable from Turner's unconditional plea.  Counsel were not ineffective for not assuring that Turner could withdraw his guilty plea after the three-judge panel returned a verdict of death because Turner has not demonstrated that such was the practice in Franklin County, nor would he have benefitted from such a practice had he proved its existence.

In an abundance of caution, this Court has found Turner's third and fifth ineffective assistance of trial counsel sub-claims preserved for habeas corpus review.  The sub-claims are nevertheless without merit, and should be denied.

## Fourth Sub-Claim - Failure to Fully Inform Turner of the Consequences of Jury Waiver

Turner claims his counsel failed to inform him that a single juror could prevent a death sentence, that he had the right to withdraw his jury waiver, that it was his decision alone to choose a jury trial, and that his chances of succeeding on an appeal were decreased if his case were tried to a three-judge panel.  (Petition, Doc. No. 20 at PAGEID 566-67.)  He

also contends his attorneys told him he could not withdraw his waiver of a jury trial when he expressed a desire to do so. *Id*. at PAGEID 566. In addition, he states he would have insisted upon a jury trial had he been fully informed of the consequences of his jury waiver. *Id*. at PAGEID 567. Respondent argues the claim is both procedurally defaulted and meritless. (Return of Writ, Doc. No. 25 at PAGEID 775-6, 789-91.) Turner claims to have presented the issue to the state court in his petition for post-conviction relief, and argues that the decision to waive a jury trial in a capital case is in all instances critical. (Traverse, Doc. No. 32 at PAGEID 1026-36.)

Turner did indeed present the instant claim to the state court as his nineteenth ground for relief in his amendment to his post-conviction petition. (Appendix, Vol. 3 at 12-14.) Turner submitted his own affidavit as support for his claim, but the trial court characterized it as "self-serving," and found that Turner understood his right to a jury trial sufficiently so that his waiver was knowing, intelligent, and voluntary. (Appendix, Vol. 8 at 382-83.) On appeal, the state court of appeals agreed with the trial court, *Turner*, 2006 WL 381820 at *11, 2006-Ohio-761 at ¶ 40, and the Ohio Supreme Court declined to accept Turner's subsequent appeal, *Turner*, 110 Ohio St. 3d 1439, 2006-Ohio-3862. Since the Ohio courts addressed Turner's claim on its merits, it is preserved for habeas review.

Turner contends he was "convinced by his counsel" to waive his right to a jury trial, and that he was "directed" to do so by his attorneys. (Traverse, Doc. No. 32 at PAGEID

-50-

1032; Petition, Doc. No. 20 at PAGEID 568.)  When Turner waived his right on the record in the trial court, however, he stated that it was his own desire to waive his right to a jury trial after consulting with his attorneys.  (Trial Tr., Vol. 1 at 64.)  In addition, Turner's trial counsel Tullis Rogers testified at the evidentiary hearing in these proceedings and stated that he was sure he had discussed all of the rights attendant to a jury trial.  (Evid. Hrg. Tr. at 117.)  Co-counsel Blaise Baker also testified, stating that he and Rogers discussed the extremely disturbing evidence in his case, specifically the 911 recording of Jennifer's murder, and recommended to Turner that he waive his right to a jury trial.  *Id*. at 450-51.  Baker testified that the decision was Turner's, however, and that Turner decided to waive a jury trial.  *Id*. at 451.  Turner's own self-serving and uncross-examined affidavit claiming he did not fully understand the right he was waiving and that his attorneys more or less wore down his resistance to waiving his right to a jury trial possesses little credibility in the light of the facts surrounding his waiver.  Even if Turner had convinced this Court that his trial counsel's performance fell below professional standards, he has not demonstrated prejudice from any error.  Considering the evidence against Turner, it is next to impossible for Turner to show that there is a reasonable probability that the outcome of his trial would have been different in any way had he exercised rather than waived his right to a jury trial.  As such, the decision of the state court of appeals to that effect was neither contrary to nor an unreasonable application of federal law articulated in *Strickland*, *supra*.

Turner has failed to demonstrate that his trial counsel's advice regarding his waiver of his right to a jury trial was in any way deficient. In addition, even if he could demonstrate deficient performance, he has not and cannot show prejudice from that deficient performance. Turner's claim that the state appellate court's decision was objectively unreasonable consequently fails, and his fourth sub-claim in his sixth ground for relief should be denied.

To sum up, none of Turner's five ineffective assistance of trial counsel sub-claims possess merit individually or cumulatively. Accordingly, his sixth ground for relief should be denied.

**Seventh Ground for Relief**

In his seventh ground for relief, Turner contends that his convictions on the aggravating circumstances attached to each count of aggravated murder were not supported by sufficient evidence. (Petition, Doc. No. 32 at PAGEID 575-78.) Respondent acknowledges the claim is preserved for habeas corpus review, but argues that it is without merit. (Return of Writ, Doc. No. 25 at PAGEID 792-802.)

Turner presented the instant claim as his fifth proposition of law to the Ohio Supreme Court on direct appeal. (Appendix, Vol. 3 at 74-76.) Specifically, he argued that there was insufficient evidence to support the three-judge panel's findings that (1) he

murdered Jennifer to prevent or in retaliation for her testimony in a criminal proceeding, (2) Jennifer's and Seggerman's murders were part of a course of conduct involving the murders of two or more people, and (3) he had previously been convicted of a crime of violence involving the murder or attempted murder of another. *Id.* Turner argued that (1) Jennifer had never testified in a criminal proceeding so her murder could not have been in retaliation for such testimony; (2) there was no evidence that he purposely killed Seggerman, so there was no purposeful killing of two or more people; and (3) that his prior conviction for attempted murder did not include an element that the attempted murder must have been purposeful, as required by the charged aggravating circumstance.

The Ohio Supreme Court overruled Turner's proposition of law, reasoning that (1) Jennifer's filing of a complaint against Turner in the telephone harassment case pending at the time of the murders constituted "testimony" for purposes of the aggravating circumstance; (2) Turner's repeated stabbing of Seggerman and his forcing Seggerman to back up one hundred yards during the attack was sufficient evidence of Turner's purpose to kill Seggerman; and (3) Virginia courts have held that a conviction for attempted murder requires proof of a specific intent to kill, satisfying the "purpose" element in the aggravating circumstance with which Turner was charged. *Turner*, 105 Ohio St. 3d 331, 340-41, 2005-Ohio-1938 at ¶¶ 52-61.

In arguing that the state supreme court's decision respecting Jennifer's testimony

in the telephone harassment case was unreasonable, Turner ignores the court's characterization of the complaint in that case as testimony. Rather than challenge that characterization, he instead persists in arguing that "[t]he evidence does not support a finding that Jennifer Turner had ever or intended to provide 'testimony' against Michael Turner," just as he argued in the state court. (Traverse, Doc. No. 32 at PAGEID 1039-40; Appendix, Vol. 3 at 75.) The filing of the criminal complaint against Turner for telephone harassment, however, is strong evidence of Jennifer's intent to testify, even under Turner's "plain and ordinary" understanding of the term. (*See* Traverse, Doc. No. 32 at PAGEID 1039.) The challenged aggravating circumstance makes an offender death eligible for killing to *prevent* testimony not yet given, as well. Moreover, Turner cites no federal law establishing that the state court's interpretation of the aggravating circumstance at issue is either contrary to or an unreasonable application of federal law, nor does he demonstrate that the state court's characterization is based on an unreasonable determination of the facts before the court. *See* 28 U.S.C. § 2254(d). Finally, Turner's plea of guilty and his stipulation to the facts supporting his plea establishes the challenged element, as well.

Turner's only argument respecting the course of conduct aggravating circumstance is that the evidence before the state trial court "clearly demonstrates that he had no reason to and no purpose to kill Ronald Seggerman . . . until Seggerman attacked him." (Traverse, Doc. No. 32 at PAGEID 1041-42.) He claims the Ohio Supreme Court's conclusion that

events just preceding Seggerman's murder established Turner's intent to kill Seggerman

is an unreasonable interpretation of the facts. *Id*. at 1042. Turner has not offered any

evidence, much less clear and convincing evidence that the state court's decision was based

on an unreasonable determination of the facts, and his weak argument is insufficient to

overcome the presumption of correctness due the state court findings of fact under the

AEDPA. 28 U.S.C. § 2254(d)(2), *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004).

Finally, Turner contends that the Ohio Supreme Court's conclusion that the Virginia

statute under which Turner was previously convicted of attempted murder satisfied the

purpose element of the course of conduct aggravating circumstance made without citation

to Virginia law and without any evidentiary support. (Traverse, Doc. No. 32 at PAGEID

1043.) Turner is mistaken. As noted above, the instant claim was presented to the state

court as Turner's fifth proposition of law on direct appeal. In its discussion of that

proposition of law, the Ohio Supreme Court stated that it had already addressed part of

Turner's claim in its discussion of his fourth proposition of law, where the court stated as

follows:

> Contrary to Turner's argument, purpose to kill *is* an essential
> element of attempted murder under Virginia law. The Virginia
> Supreme Court has held: "To sustain a conviction of an
> attempted crime, the evidence must establish a specific intent
> to commit the crime * * *." *Howard v. Commonwealth* (1981), 221
> Va. 904, 906, 275 S.E.2d 602.
>
> Accordingly, in order to sustain a conviction of attempted

murder, the evidence must establish a specific intent to kill, as the Virginia Supreme Court has held. "[A]ttempted murder requires proof of an intent to kill * * *." *Martin v. Commonwealth* (1991), 242 Va. 1, 5, 406 S.E.2d 15. "[I]n order to prove the crime of attempted murder, the evidence must show a specific intent to kill the victim * * * coupled with some overt but ineffectual act in furtherance of this purpose." *Epps v. Commonwealth* (1975), 216 Va. 150, 156, 216 S.E.2d 64. See, also, *Coleman v. Commonwealth* (2001), 261 Va. 196, 200, 539 S.E.2d 732; *Nobles v. Commonwealth* (1977), 218 Va. 548, 551, 238 S.E.2d 808; *Hargrave v. Commonwealth* (1974), 214 Va. 436, 437, 201 S.E.2d 597; *Thacker v. Commonwealth* (1922), 134 Va. 767, 770-772, 114 S.E. 504. Turner cites no Virginia case holding that a defendant may be convicted of attempted murder *without* proof of specific intent to kill.

*Turner*, 105 Ohio St. 3d 331, 338-39, 2005-Ohio-1938 at ¶¶ 46-47. In his Petition and Traverse in these proceedings, Turner still provides no support for his claim that the Virginia statute under which he was convicted of attempted murder possesses no *mens rea* requirement. Thus, he has not demonstrated that the Ohio Supreme Court's decision is unreasonable in any way.

Furthermore, Turner pled guilty to each of the aggravating circumstances he now challenges, and he stipulated to the facts supporting his guilty plea. He has provided this Court with no convincing argument as to why his guilty plea to the aggravating circumstances should be disregarded. Having failed to demonstrate that the Ohio Supreme Court's decision rejecting his claim that there was insufficient evidence to convict him of the aggravating circumstances attached to the two counts of aggravated murder was

objectively unreasonable or based on an unreasonable determination of the facts, Turner is not entitled to the extraordinary relief he requests.  His seventh ground for relief should be denied.

**Eighth Ground for Relief**

Turner has withdrawn his eighth ground for relief.  (Traverse, Doc. No. 32 at PAGEID 1044.)

**Ninth Ground for Relief**

In his ninth ground for relief, Turner contends his trial counsel's representation in the mitigation phase of his trial was constitutionally deficient for numerous reasons (Petition, Doc. No. 20 at PAGEID 582-622.)  Turner's sub-claims will be addressed in the order the parties address them in the Return of Writ and Traverse, and addressing related sub-claims together.  There is no need to repeat the governing law respecting ineffective assistance of counsel claims, as it was set forth in this Court's discussion of Turner's sixth ground for relief, *supra*.

**First and Second Sub-Claims - Failure to Challenge Aggravating Circumstances**

In his first and second sub-claims, Turner asserts that his attorneys were ineffective

because they failed to contest the proof offered by the state to establish the course of conduct and prior conviction aggravating circumstances attached to each count of aggravated murder. (Petition, Doc. No. 20 at PAGEID 583-87.)  Respondent acknowledges the sub-claims are preserved for habeas review, but argues they are without merit. (Return of Writ, Doc. No. 25 at PAGEID 807-8, 813-19.)

When presented with the instant claims, the state court of appeals concluded that "[t]he stipulated facts establish Turner's purpose to kill [Seggerman] . . ., [and] we cannot conclude that Turner's counsel provided ineffective assistance simply because they did not argue otherwise." *Turner*, 105 Ohio St. 3d at 340-41, 2005-Ohio-1938 at ¶ 51, 57.  The court also determined that Turner's claim that the lack of evidence supporting the "prior conviction" aggravating circumstance should have been argued by his attorneys was unfounded. *Id*. at 341, ¶¶ 58-60.  The court of appeals gave three reasons why that was so: (1) the Virginia statute under which Turner had been previously convicted of attempted murder did contain the requisite *mens rea* element; (2) the prosecutor was not required to prove the content of the Virginia statute since a court's taking judicial notice of a statutory law of another state is treated as a ruling on a question of law; and (3) Turner stipulated that he had been convicted of attempted murder in Virginia.  *Id*.

Turner's raising these sub-claims in a ground for relief that is specifically limited to his counsel's performance during the penalty phase of his trial is puzzling.  In Ohio, the

-58-

aggravating circumstances making a defendant eligible for the death penalty are established beyond a reasonable doubt in the guilt phase of the bifurcated capital trial. Ohio Rev. Code. § 2929.03.  Therefore, any challenge to the evidence supporting the aggravating circumstances must be made at that stage of the trial rather than during the penalty phase.  This Court is aware of no mechanism by which Turner's attorneys might have challenged the evidence supporting the aggravating circumstances in the penalty phase of Turner's trial, and Turner does not assert that any such mechanism exists.  Even if there were a procedure available to do so, however, an attempt to challenge the evidence supporting the aggravating circumstances would have failed for the reasons discussed in this Court's consideration of Turner's seventh ground for relief, *supra*, not the least of which is that Turner pled guilty to the aggravating circumstances, and stipulated to the facts supporting them.  For all of these reasons, Turner's counsel did not provide ineffective assistance in failing to challenge the evidence establishing the course of conduct and prior conviction aggravating circumstances, and his first and second sub-claims should be denied.

**Third and Sixth Sub-Claims - Failure to Conduct an Adequate Mitigation Investigation**

Next, Turner contends his trial counsel failed to reasonably and competently investigate, prepare, and present available mitigation evidence of his alcohol and drug dependence even though it was the primary mitigating factor.  (Petition, Doc. No. 20 at

-59-

PAGEID 587-92, 600-08.) Respondent acknowledges the claim is preserved for habeas corpus review, but argues it is nevertheless meritless because Turner has demonstrated no prejudice from any omission. (Return of Writ, Doc. No. 25 at PAGEID 808, 810, 819-22, 828-32.)

Respondent alleges Turner presented the instant sub-claims to the state court as his seventh, eighth, ninth, tenth, and fourteenth claims for relief in his petition for post-conviction relief. (Return of Writ, Doc. No. 25 at PAGEID 808, 810; Appendix, Vol. 5 at 38-49, 58-60.) Turner attempted to support his tenth post-conviction claim by submitting his stepdaughter's affidavit in which she opined upon trial counsel's lack of thoroughness in preparing for the mitigation phase of the trial. (Appendix, Vol. 5 at 73-74.) The trial court dismissed that claim, finding it unsupported by competent evidence and noting that materials describing Turner's trial counsel's preparation for the mitigation phase did not preclude other preparations counsel engaged in for the mitigation phase. (Appendix, Vol. 8 at 381.) The state court of appeals agreed with the trial court in all respects, and affirmed the trial court's dismissal of Turner's post-conviction petition. *Turner*, 2006 WL 391820 at *6, 2006-Ohio-761 at ¶¶ 24-25. The Ohio Supreme Court declined further review. *Turner*, 110 Ohio St. 3d 1439, 2006-Ohio-3862.

Relating to Turner's seventh, eighth, ninth, and fourteenth claims for relief in his post-conviction petition, Turner attached the affidavits of Edward Turner, Paula Cox, Billy

Harbor, and Larry Hancock in support, claiming that his counsel should have called each

of them as a witness to testify about his long-term abuse of alcohol and drugs.  (Appendix,

Vol. 5 at 38-46, 58-60, 79-90.)  The post-conviction trial court dismissed the claims finding

that Turner had failed to demonstrate that there was a reasonable probability that the

outcome of his trial would have been different had the four witnesses been called to testify

in the mitigation hearing.  (Appendix, Vol. 8 at 379-80, 382.)  The state court of appeals

subsequently addressed Turner's claims together as follows:

> Appellant contends in his seventh, eighth, ninth, and
> fourteenth claims for relief that counsel was [sic] ineffective for
> failing to call four mitigation witnesses who would have
> testified that alcohol had a devastating effect on appellant's
> behavior.  Appellant argues that his brother Edward Turner,
> his ex-wife Paula Cox, and two friends, Billy Harbor and Larry
> Hancock, would have testified about their firsthand experience
> with appellant's alcoholism.   These individuals provided
> affidavits stating what their testimony would have included
> had they been called as witnesses.
>
> Both appellant's brother and ex-wife were identified as
> potential witnesses on appellant's witness list submitted before
> the mitigation hearing.  Neither of them, however, testified on
> appellant's behalf.  It would appear that appellant's counsel
> made a tactical decision not to call these witnesses.  Decisions
> regarding what witnesses to call falls [sic] within the purview
> of trial strategy and, absent prejudice, generally will not
> constitute ineffective assistance of counsel. . . .  To show
> prejudice, appellant must show that there is a reasonable
> probability that the evidence would have swayed the three-
> judge panel to impose a life sentence rather than the death
> penalty. . . .  A review of the witnesses' affidavits does not
> justify such a finding.  Edward Turner's affidavit discussed

appellant's use of alcohol but did not describe any negative consequences from his drinking. Also, his affidavit noted that appellant seemed obsessed with his ex-wife and wrote letters to her while they were separated even though he did not know where she lived. Thus, his testimony was not entirely helpful. Moreover, because [Edward] Turner's testimony about appellant's drinking was largely cumulative of testimony offered by other witnesses, it was not likely to change the sentence imposed.

Similarly, Paula Cox's affidavit was not very helpful to appellant. She described appellant's history of drinking and his erratic and violent behavior when he drank, although she did not indicate when this conduct occurred. Her affidavit was not entirely helpful, however, as it demonstrated that appellant had a long history of violent behavior when drinking and chose not to address his violent temperament. Again, because this testimony is largely cumulative of testimony offered by other witnesses, we cannot say that her testimony would have altered the decision to impose a sentence of death.

The other two potential witnesses identified by appellant, Harbor and Hancock, were not listed on appellant's witness list. Their affidavits, however, failed to set forth sufficient operative facts demonstrating prejudice. Harbor's affidavit described appellant as a drinker but did not indicate that appellant was an alcoholic or even how much he drank. He also did not describe any violent acts which occurred due to appellant's drunkenness. Harbor also failed to state the time period involved when he observed appellant. Hancock's affidavit better described appellant's alcoholism and his erratic and violent behavior when drunk. However, the affidavit was not in all aspects helpful. It showed that appellant had a history of drunken, violent behavior and chose not to address this problem. Given the contents of these affidavits, we cannot say that the testimony from these two witnesses would have altered the decision to impose a sentence of death.

. . .

> The evidence upon which appellant relied for his seventh, eighth, ninth and fourteenth claims was largely cumulative of evidence that was submitted through appellant's mother, daughter and expert witness, Dr. Haskins. The impact that alcohol abuse had on appellant's life was addressed at length during the mitigation hearing by appellant's trial counsel. Accordingly, although appellant presented evidence outside the record, that evidence did not demonstrate that his trial counsel was [sic] deficient for failing to call these witnesses during the mitigation hearing. The trial court did not err by dismissing appellant's seventh, eighth, ninth and fourteenth claims for relief . . . .

*Turner*, 2006 WL 391820 at *7-8, 2006-Ohio-761 at ¶¶ 29-33.

Here, Turner identifies five (not four) people who could have testified about his long-term alcoholism, but who were not called by his counsel in the mitigation phase; the four already mentioned, and his stepson Adam Turner.[7] (Traverse, Doc. No. 32 at PAGEID 1062-68.) First, he contends Adam's affidavit would have helped establish the fact of his alcoholism at trial. In that affidavit, Adam indicated he would have testified on Turner's behalf in the mitigation phase of the trial had he been called as a witness, but his refusal to testify when called upon to do so in these proceedings (Doc. No. 111 at PAGEID 2063), and his failure to even show up in Virginia for his scheduled deposition in lieu of live

---

[7]Turner did not identify Adam as one of the individuals his trial counsel should have called to testify when he presented the instant claim to the state post-conviction court, although he did include an affidavit from Adam as support for a different claim in his post-conviction petition. (Appendix, Vol. 5 at 35-37, 47-49, 77-78.)

testimony at Turner's evidentiary hearing (*see* Doc. No. 118-4 at PAGEID 2158-59), renders that assertion dubious at best.  (Appendix, Vol. 5 at 77-78; Evid. Hrg. Tr. at 537-8.)  In addition, uncross-examined affidavits do not carry the same weight as does live testimony subjected to cross-examination, and the weight to be accorded affidavits is a matter within the habeas court's discretion.  *See Brofford v. Marshall*, 751 F.2d 845, 853 (6th Cir. 1985).  Furthermore, insofar as Turner alleges Adam could have testified about Turner's long-term alcoholism, there was evidence in the record at trial that established that fact.  For instance, Turner's mother, Reva, testified that Turner's marriage to Paula Cox ended because of Turner's drinking, that he started drinking at a young age, and that he had received treatment for his alcoholism.  (Trial Tr., Vol. 2 at 67, 75.)  Dr. Kristin Haskins also testified about Turner's alcoholism, stating that it contributed to the end of Turner's marriage to Paula, that his marriage to Jennifer was based to some degree on their fondness for alcohol and cocaine, and that Turner had been unsuccessfully treated in both inpatient and outpatient facilities for alcoholism.  *Id.* at 131-33, 140.  Had Adam been called to testify, had he appeared, and had he testified consistent with his affidavit, his testimony would have been merely cumulative to that already in the record.  And of course the Court could not have considered the testimony under *Cullen, supra*.

Even if this Court were convinced that Adam would have testified had he been called to do so at trial, the decision of which witnesses to call is primarily a strategic

decision for trial counsel to make and is presumed to be reasonable. *Awkal v. Mitchell*, 613 F.3d 629, 641 (6th Cir. 2010), *citing Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008). *Strickland* itself requires this Court to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" 466 U.S. at 689, *quoting Michel v. Louisiana*, 350 U.S. 91, 101 (1955). Turner has presented no evidence that his trial counsel's decision not to call Adam was anything but sound trial strategy. Although Adam's affidavit contains some positive comments about the kind of father Turner was to Adam, it also indicates that Turner would roll marijuana cigarettes in front of Adam, that Turner would allow the fifteen- or sixteen-year-old Adam to "party" with him, and that Turner threatened teenaged Adam after accusing him of cheating at cards. (Appendix, Vol. 5 at 77-78.) Thus, presentation of Adam's testimony might well have been more prejudicial than beneficial to Turner's case in mitigation.

Turner has presented no evidence obtained through discovery or through testimony at the evidentiary hearing in these proceedings establishing that trial counsel were deficient in failing to call Adam Turner in the mitigation phase. That there is little evidence in the record to indicate that trial counsel extensively interviewed Adam is insufficient to affirmatively show that trial counsel did not do so. As such, Turner has not overcome the

presumption that trial counsel's decision was outside the "wide range of reasonable professional assistance" discussed in *Strickland*, *supra*.  In addition, he has not shown prejudice from counsel's failure to present Adam's testimony as it would have been merely cumulative to evidence already in the record.

Next, Turner contends his counsel's failure to call Larry Hancock to testify at his mitigation hearing constituted ineffective assistance.  (Petition, Doc. No. 20 at PAGEID 589.)  Hancock's affidavit was presented to the state court as support for Turner's fourteenth claim for relief in his state post-conviction petition.  (Appendix, Vol. 5 at 58-60, 79-80.)  Hancock stated Turner possessed a "wicked temper" when he was drinking and gave several examples of Turner's violent conduct and mouthy tirades while intoxicated, and he described Turner's ability to drink large quantities of alcohol.  *Id*.  In his habeas proceedings, Turner requested and was granted permission to present Hancock's testimony at the evidentiary hearing (Turner's Renewed Motion for an  Evidentiary Hearing, Doc. No. 83 at PAGEID 1454; Decision and Order Granting in Part and Denying in Part Petitioner's Motion for an Evidentiary Hearing, Doc. No. 93 at PAGEID 2005.)  In lieu of live testimony, Hancock's January 26, 2010, deposition was submitted, as Hancock is a resident of Virginia and lives outside the reach of this Court's subpoena power.

In his deposition, Hancock stated that he and Turner lived not far from each other and would get together periodically to drink.  (Doc. No. 118-2 at PAGEID 2136.)  At times,

-66-

Turner would "get real violent," so much so that he would spit, and once kicked in Hancock's door. *Id*. Another time, Turner threw his own brother Edward out a window. *Id*. Hancock and Turner even fought once when Turner was only "somewhat drunk." *Id*. at PAGEID 2137. Most of the time Hancock and Turner spent together included drinking alcohol, and Turner's capacity for alcohol consumption was apparently considerable. *Id*. at PAGEID 2136. Hancock stated that he would have testified at Turner's trial had he been subpoenaed, and that he would have been willing to testify if he had been able to come to Ohio. *Id*. at PAGEID 2137.

As with Adam Turner's affidavit, Hancock's statements in his deposition would have provided some support for Turner's argument in the trial court that his alcoholism should mitigate the penalty in his case. There is, however, significant negative evidence of Turner's repeated violent conduct toward other family members and friends in Hancock's deposition as well. Had his testimony been presented in the mitigation phase of Turner's trial, there is little probability that Turner would have been sentenced to life rather than death.

Turner also argues that his brother Edward Turner should have been called as a witness in the mitigation phase of his trial. (Petition, Doc. No. 20 at PAGEID 589.) Edward's affidavit was presented to the state court in support of Turner's seventh post-conviction claim for relief. (Appendix, Vol. 5 at 38-40, 81-83.) Edward lives in Virginia, as

-67-

well, and his deposition was submitted to this Court in lieu of live testimony.  Edward

stated that Turner consumed alcohol "all the time" and was intoxicated most of the time.

(Doc. No. 118-3 at PAGEID 2143-44.)  He described Turner as having a temper when he

was drunk, but also said his own temper when drunk was "a whole lot worse" than

Turner's.  *Id*. at PAGEID 2145.  Edward also related an incident where Turner asked

Edward if he wanted to drive Turner's employer's van to the store.  *Id*. at PAGEID 2144.

Edward was in sixth grade at the time, and crashed the van, sustaining fairly serious

injuries to his hand. *Id*.  Edward lived with Turner for a short period after Jennifer had left

for Ohio, during which time both men consumed alcohol nightly.  *Id*.  After Jennifer moved

back into the residence, Edward remained there for another month and the nightly

drinking, this time among all three of them, continued.  *Id*. at PAGEID 2147.  Edward also

described an incident when he and his friends went to Turner's house to drink and

discovered Turner "passed out" in front of the television in the smoke-filled house.  *Id*. at

PAGEID 2145.  While one could certainly infer that Turner had passed out due to excessive

alcohol consumption, that is by no means clear from Edward's deposition.  It is impossible

to know whether Turner lost consciousness because of his drinking or whether he simply

fell asleep while watching television.  Edward expressed anger when he explained how

Turner had left their father on his death bed to reunite with Jennifer in Ohio, and returned

only after their father's death for the funeral.  *Id*. at PAGEID 2146.  Even then, Turner began

drinking immediately, going so far as to ask his stepdaughter Brandi to stop on her way to the airport and buy some alcohol for him, which she did. *Id*. Turner also smoked marijuana and used cocaine, but he was always drinking alcohol. *Id*. at PAGEID 2146-47, 2151. Edward stated that he had no idea Turner was on trial and that no one contacted him to talk about testifying in court. (Doc. No. 118-3 at PAGEID 2151.) Although he was aware at the time of the trial that his mother and Brandi were going to Columbus, Ohio, he could not recall what his mother had told him about the purpose of their trip, nor did he recall swearing out his affidavit during Turner's post-conviction proceedings. *Id*. at 2151 -52.

There is no doubt that Edward's deposition testimony concerning Turner's abuse of alcohol contains more detail than the testimony from Turner's mother and stepdaughter in the mitigation phase of his trial. Dr. Haskins also testified at trial, however, and offered her expert opinion that Turner was alcohol and drug dependent, an opinion the state trial court credited. (Appendix, Vol. 3 at 27.) She testified to Turner's repeated attempts to get treatment for his alcoholism and remain sober, and to the role his alcoholism played in his failed marriage to Paula Cox, his difficulty in maintaining steady employment, and his discharge from the Navy. (Trial Tr., Vol. 2 at 130-36.) Dr. Haskins also stated that Turner's tendency toward aggression was always present, but tended to come to the surface when he was drinking alcohol. *Id*. at 177. Edward's testimony might have corroborated Dr. Haskins' about Turner's alcoholism, and may even have added some specific examples of

Turner's violent behavior while intoxicated, but it is unlikely to have impacted the result of his trial because it is generally cumulative of evidence presented through Dr. Haskins' testimony.

Turner also contends his attorneys were ineffective for failing to present the testimony of his former wife, Paula Cox in the mitigation phase of his trial. (Petition, Doc. No. 20 at PAGEID 589.) Cox's affidavit was presented to the state court in support of Turner's ninth post-conviction claim for relief. (Appendix, Vol. 5 at 44-46, 84-87.) Because Cox lives in Virginia as well, her deposition was submitted in lieu of testimony in these habeas proceedings. Cox stated that she and Turner had been married approximately one year when Turner began drinking, and that prior to that time, he neither drank nor used drugs. (Doc. No. 18-1 at PAGEID 2107, 2114.) As time progressed, he began drinking greater quantities and more frequently until he drank on a daily basis. *Id*. at PAGEID 2107-8. When Turner was intoxicated, he was clumsy and distant and would sometimes hit the walls of their home. *Id*. at PAGEID 2108. Cox described Turner's difficulty maintaining employment because of his drinking and stated that he eventually started abusing drugs as well as alcohol. *Id*. at PAGEID 2109, 2124. Although Cox denied Turner had ever struck her, she acknowledged that he had tried to choke her once and that she had fled the family home with her son after that incident. *Id*. at PAGEID 2109-10. She stayed at a shelter for approximately one month, but after Turner told her he would "straighten up," she

-70-

returned to their home. *Id*. at PAGEID 2110. Turner did not keep his word, however, and his alcohol consumption resumed and was even worse. *Id*. Eventually, she left Turner for good because of his drinking, his drug use, and his infidelity *Id*. at PAGEID 2110-11, 2118-19.

Cox's memory of events before, during, and after Turner's trial was extremely uncertain. She could not recall whether she had spoken with any member of Turner's defense team, whether she discussed Turner's predicament with her daughter or Turner's mother, why she did not go to Columbus to testify, why she did not want to testify in this Court's evidentiary hearing, or whether she would have done so had she been asked. (Doc. No. 118-1 at PAGEID 2121-23.) None of the information Cox provided in her deposition was unknown to the three-judge panel at trial, except perhaps Cox's description of Turner's having choked her once. Evidence of Turner's alcoholism, attempts to give up alcohol, inability to maintain stable employment, and the eventual end of his marriage to Cox because of his drinking was presented through Dr. Haskins. (Trial Tr. at 248-300.) In any event, additional testimony from Cox in these proceedings cannot be considered in determining whether a state court ruling was objectively unreasonable. *Cullen, supra*.

Finally, Turner contends his counsel should have called Billy Harbor to testify in the mitigation phase of his trial, and that their failure to do so constitutes ineffective assistance. (Petition, Doc. No. 20 at PAGEID 589; Traverse, Doc. No. 32 at PAGEID 1067-68.) Harbor's

affidavit was submitted as support for Turner's eighth post-conviction claim for relief in the state court (Appendix, Vol. 5 at 41-43, 88-90). In his affidavit, he stated that he met Turner in 1985 after Turner's release from prison. *Id*. at 88. Unlike the witnesses Turner claims should have been presented at trial, Harbor recalled that "when Michael drank, it didn't take but a swallow to get him cranked up," and that Turner "could talk himself out of trouble even when the police were called." *Id*. at 89. Other than those two not-so-helpful statements, the rest of the information Harbor provided about Turner's alcoholism was presented through other witnesses at Turner's trial. Specifically, Harbor mentioned that Turner's drinking prevented him from maintaining stable employment, the role Turner's drinking played in the demise of his marriage to Cox, and Turner and Jennifer's shared involvement with alcohol. *Id*. at 88-89. Thus, the testimony Harbor could have provided at trial was either cumulative to that presented through other witnesses, or was more harmful than helpful to his case in mitigation.

Turner argues that his counsel were ineffective for failing to investigate and present the evidence Adam Turner, Larry Hancock, Edward Turner, Paula Cox, and Billy Harbor would have been able to provide had they been called as witnesses. Nearly all of the testimony those individuals could have given, however, was cumulative to that presented through Dr. Haskins. The evidence that was not cumulative was, for the most part, damaging: evidence such as Turner's attempt to choke Cox, his defenestration of his

brother, his violent nature when he was drinking, his allowing the teenaged Adam Turner to drink alcohol with him, and his permitting his eleven-year-old brother to drive his employer's vehicle. None of that evidence would have inhered to Turner's benefit.

The Sixth Circuit Court of Appeals has summarized counsel's duty to perform a mitigation investigation in *Carter v. Mitchell*, 443 F.3d 517, 532 (2006), as follows:

> The Supreme Court has found more limited investigations into a defendant's background justified where any evidence presented would have a "double edge." *Wiggins v. Smith,* 539 U.S. 510, 535 (2003) (citing *Burger v. Kemp*, 483 U.S. 776 (1987); *Darden v. Wainwright*, 477 U.S. 168 (1986)). This Court has recently stated that counsel's "strategic decision to limit testimony about [defendant]'s past in order to prevent 'opening-the-door' [sic] to evidence of [defendant]'s criminal background supported "the reasonableness of the Ohio Court of Appeals' determination regarding the performance of defense counsel." *Clark v. Mitchell*, 425 F.3d 270, 286 n.6 (6th Cir. 2005). Thus, this Court has concluded that it is "not even deficient performance, let alone prejudicial, " for trial counsel to fail to introduce evidence of a defendant's background that "would likely [make] him look even worse to the jury." *Moore v. Parker*, 425 F.3d 250, 254 (6th Cir. 2005).

*Carter v. Mitchell*, 443 F.3d 517, 532 (6th Cir. 2006). Of course, counsel cannot evaluate a potential witness' testimony if he or she is not aware of the witness or what the witness might testify to if called. And that is the crux of Turner's claim. Even if trial counsel's investigation was not as thorough as it might have been, however, the evidence that could have been elicited from the five witnesses Turner claims his counsel should have called was more harmful than helpful to Turner's mitigation case, and was cumulative to Dr.

Haskins' testimony.  All of the helpful information, to wit, the witnesses' knowledge of Turner's alcoholism, is outweighed by the harmful information, specifically, that Turner had choked Paula Cox during their marriage, that he had thrown his brother out of a window, that he had a violent nature when drinking, that he provided alcohol to his underage brother, and that he put his brother in danger by allowing him to drive Turner's employer's vehicle.  None of those facts would have mitigated in favor of a life sentence rather than death.  Moreover, the Ohio Supreme Court has repeatedly recognized that chronic alcoholism is at most a weak mitigating factor.  *State v. Foust*, 105 Ohio St. 3d 137, 170, 823 N.E.2d 836 (2004); *State v. Gapen*, 104 Ohio St. 3d 358, 387, 819 N.E.2d 1047 (2004); *State v. Nields*, 93 Ohio St. 3d 6, 43, 752 N.E.2d 859 (2001); *State v. Wilson*, 74 Ohio St. 3d 381, 401, 659 N.E.2d 292 (1996); *State v. Slagle*, 65 Ohio St. 3d 597, 614, 605 N.E.2d 916 (1992).  Thus, the evidence of Turner's alcoholism would not have possessed significant weight in mitigation.

For all of the reasons above, Turner has failed to demonstrate that is trial counsel were deficient in determining which witnesses to present at Turner's mitigation hearing. In addition, Turner has not carried his burden of showing that had his trial counsel presented the five witnesses there is a reasonable probability that the three-judge panel would have returned a life sentence rather than a death verdict.  The Ohio Court of Appeals' dismissal of Turner's claims in post-conviction was consequently neither contrary

to nor an unreasonable application of federal law as determined by the United States Supreme Court.  Turner's third and sixth sub-claims of his ninth ground for relief should be denied.

**Fourth Sub-Claim - Failure to Present Evidence of Turner's Adaptability to Prison**

Turner argues his counsel provided ineffective assistance by failing to present evidence of his adaptability to prison life.  (Petition, Doc. No. 20 at PAGEID 593-96.) Respondent correctly acknowledges that Turner presented the issue to the state court as his fifth claim for relief in his petition for post-conviction relief.  (Return of Writ, Doc. No. 25 at 809; Appendix, Vol. 5 at 33-34.)  The state trial court dismissed Turner's claim because it found he had not demonstrated deficient performance of his counsel.  (Appendix, Vol. 8 at 378.)  On appeal, the state court of appeals concluded that Turner had not provided any evidence to support his claim other than medical records created while Turner was incarcerated at the Franklin County Corrections Center awaiting trial for the murders of Jennifer and Seggerman, records that were insufficient to demonstrate trial counsel's alleged ineffectiveness.  *Turner*, 2006 WL 391820 at *6, 2006-Ohio-761 at ¶ 26.

In *Skipper v. South Carolina*, 476 U.S. 1 (1986), the United States Supreme Court held that evidence that a petitioner "had been a well-behaved and well-adjusted prisoner" is "potentially mitigating" and "may not be excluded from the sentencer's consideration." *Id*. at 4-5.  Here, Turner contends his attorneys should have presented the same Franklin

County Corrections Center records as well as evidence of Turner's "positive adjustment to prison while incarcerated in Virginia." (Traverse, Doc. No. 32 at PAGEID 1071.)  At Turner's trial, however, Dr. Haskins testified that she reviewed the Franklin County records, that Turner made productive use of his time when he was incarcerated, but that while Turner was in custody in Virginia and being transported, he attempted to murder a deputy with a letter opener. (Trial Tr., Vol. 2 at 124, 134, 181; *see also* Testimony of Dr. Robert Smith, Evid. Hrg. Tr. at 51-52.) Dr. Haskins also testified that Turner responds well to structure and reduced availability of alcohol and drugs, that he had caused no major problems in jail since his arrest, and that he could be expected to adjust to life in prison if he were sentenced to life rather than death. *Id*. at 156.  While the actual records of Turner's adjustment to incarceration while awaiting trial on the aggravated murder charges were not entered into evidence, the essential point Turner argues should have been presented to the three-judge panel *was* presented through Dr. Haskins' testimony, along with the evidence of Turner's prior attempted murder of the deputy while incarcerated.

It should be noted as well that in its sentencing opinion the state trial court acknowledged Turner's having made productive use of his time in prison in Virginia by taking advantage of the educational opportunities available, and observed that Turner described himself as a model prisoner in his unsworn statement. (Appendix, Vol. 3 at 22-23.)  More to the point, the court acknowledged that Turner was "dutiful and followed

direction during his period of incarceration in Virginia," that he was "productive in that
he attended schools, tried college, and obtained a certificate for electrical expertise." *Id*. at
29.  The court also observed that Dr. Haskins testified Turner was not psychopathic and
would present little threat to fellow inmates." *Id*.  The court accorded those facts some
weight in mitigation in spite of Turner's attempted murder of a deputy while incarcerated.
*Id*.  Thus, it appears that the trial court was aware of Turner's ability to adjust to prison life
even though his trial counsel did not present the actual documentary evidence from
Franklin County and Virginia.  Finally, the post-conviction court of appeals, which had the
Franklin County records before it, found that while the Franklin County documentary
evidence includes information respecting Turner's medical and psychological condition
while awaiting trial, "[t]hey do not . . . describe appellant's behavior while in prison, his
interaction with other prisoners and staff of the prison, or his compliance with the rules
and regulations of the institute." *Turner*, 2006 WL 391820 at *6, 2006-Ohio-761 at ¶ 26.

The Ohio Court of Appeals' dismissal of Turner's claim was neither contrary to nor
an unreasonable application of *Strickland*.  Turner's trial counsel did put before the court,
through Dr. Haskins' testimony, evidence of his adjustment and productive use of time
during his prior incarcerations and while awaiting trial.  That counsel chose to present that
evidence through an expert witness rather than through documentary evidence is
obviously a tactical choice; the three-judge panel was aware of Turner's conduct while

-77-

incarcerated in the past, and indeed gave that evidence some weight in mitigation. Thus, Turner's claim that the evidence was not before the sentencer is factually incorrect. As such, his fourth sub-claim in his ninth ground for relief should be denied.

**Fifth Sub-Claim - Failed to Present Evidence of Low Serotonin**

Turner argues next that his trial counsel's failure to present available evidence of the adverse effects of low serotonin. (Petition, Doc. No. 20 at PAGEID 596-600.) Respondent acknowledges the claim is preserved for habeas corpus review, but contends that it is nevertheless meritless. (Return of Writ, Doc. No. 25 at 809, 825-28.) The state post-conviction trial court dismissed Turner's claim reasoning that Turner had not connected the low-serotonin theory to Turner's particular biochemistry. (Appendix, Vol. 8 at 379.) The court of appeals agreed, holding that the existence of an alternative theory of mitigation does not render counsel ineffective when a meaningful concept of mitigation was presented at trial, as it found was the case at Turner's trial. *Turner*, 2006 WL 391820 at *7, 2006-Ohio-761 at ¶ 28.

Turner did not seek to introduce any evidence that his level of serotonin was or is any lower than average at the evidentiary hearing in these habeas proceedings. (*See* Renewed Motion for Evidentiary Hearing, Doc. No. 83.) In addition, Dr. Robert Smith, the psychological expert who testified at the evidentiary hearing, never mentioned the word "serotonin" in his testimony. (Evid. Hrg. Tr. at 7-61.) Thus, even if Turner's trial counsel

had thoroughly researched serotonin and its impact on behavior, nothing in the record before this Court suggests that it would have benefitted Turner. Turner does not claim to suffer from low serotonin. Instead, his argument is that his counsel, had they properly researched serotonin's impact on criminal behavior, would have been moved to have Turner tested for the condition. But unless Turner can demonstrate that he actually has the condition, he can show no prejudice from counsel's failure to investigate the low serotonin issue. In addition, counsel is not required to investigate every possible condition that may impact behavior. Counsel is only required to do so if there is a reason to suspect the client may be suffering from the specific condition. Turner has not demonstrated *any* reason to believe that he suffers from low serotonin, and does not even assert that he does. Thus, neither prong of the *Strickland* test is satisfied, and Turner's fifth sub-claim of his ninth ground for relief should consequently be denied.

**Seventh Sub-Claim - Failure to Document Turner's Extreme Intoxication**

Turner next contends that although ample evidence was available to demonstrate his "extreme intoxication" at the time of the murders, his trial counsel failed to use that evidence in the mitigation phase of his trial. (Petition, Doc. No. 20 at PAGEID 608-11.) Respondent argues the claim is meritless, though admitting it has been preserved for habeas corpus review. (Return of Writ, Doc. No. 25 at 810-11.)

Turner presented the issue to the state court as his eleventh claim for relief in his

post-conviction petition.  (Appendix, Vol. 5 at 50-52.)  The post-conviction trial court dismissed the claim, finding Turner had failed to demonstrate that there was a reasonable probability that the result of his penalty hearing would have been different had evidence of Turner's intoxication at the time of the murders been introduced.  (Appendix, Vol. 8 at 381-82.) The court of appeals affirmed, reasoning that "[i]n light of the significant evidence of premeditation, we cannot say that the additional evidence appellant points to in his petition would have changed the result of the mitigation hearing." *Turner*, 2006 WL 391820 at *9, 2006-Ohio-761 at ¶ 34.

Rather than show how the state court of appeals' decision was contrary to or an unreasonable application of *Strickland*, Turner merely paraphrases the arguments he made in the state court. (Traverse, Doc. No. 32 at 1075-77; Post-Evid. Hrg. Brief, Doc. No. 126 at PAGEID 3379-82.)  Turner argues that his extreme inebriation during the murders is obvious from the condition in which and location where he was found, the discovery of a half-empty bottle of alcohol near where he was found, the police officers' having been "forced" to let Turner "sleep it off" before interrogating him, and that there was some sort of mess at the police station that needed to be cleaned up. (Petition, Doc. No. 20 at PAGEID 608-9; Traverse, Doc. No. 32 at PAGEID 1075-76; Post-Evid. Hrg. Brief, Doc. No. 126 at PAGEID 3379-80.)  None of these arguments address the decision or reasoning of the Ohio Court of Appeals, to wit, that the extensive planning Turner engaged in for weeks before

-80-

the murders demonstrates premeditation, which significantly discounts Turner's claim of having committed the murders in an alcoholic blackout.

Some of the arguments Turner has made strain credulity.  For instance, Turner repeatedly contends that the police officers noted that Turner had "made a mess" that had to be cleaned up while he was "sleeping it off." *Id*.  In fact, one of the interrogating officers simply said, "There's a mess back there.  We gotta clean it up," at the outset of Turner's questioning. (Appendix, Vol. 5 at 145.) Turner's misquotation of the officer's words would have this Court believe that the officer attributed whatever mess that had been made to Turner's inebriation, a leap this Court will not attempt.  The officer merely noted that there was a mess (of some kind) back there (wherever that might be in the police station), and that it had to be cleaned up.  Those words, when accurately read, are ambiguous, and it is simply unknowable at this point in time to know to what mess or what kind of mess the officer was referring.  Consequently, they add nothing to Turner's claim that he was "extremely intoxicated" the night of the murders.

Turner also contends he was so inebriated that the officers were "forced" to let him "sleep it off" before interrogating him.  (Petition, Doc. No. 20 at PAGEID 609; Traverse, Doc. No. 32 at PAGEID 1076; Post-Evid. Hrg. Brief, Doc. No. 126 at PAGEID 3380.)  In reality, the exchange between Turner and the officer making the "sleep it off" comment transpired as follows:

> [Officer] Early:   When you get upset do you sometimes drink? Has it been a problem in the past?
>
> Turner:   Yea[h], I drink but, I got here tonight.  You can ask the officers.  I was aware of what I was doing. . . .
>
> Early:   You kind of slept it off too.

(Appendix, Vol. 5 at 174.)  Nothing in that part of the conversation indicates that the officer determined that Turner was so intoxicated that he had to be allowed to "sleep it off," as Turner has suggested.  The officer could very well have been referring to the time between the murders and Turner's arrest, during which Turner was either sleeping or passed out in some bushes.  Turner acknowledges that his booking process at the police station was completed at 11:30 p.m., and that his interrogation began about an hour and a half later. (Petition, Doc. No. 20 at PAGEID 608; Traverse, Doc. No. 32 at PAGEID 1075; Post-Evid. Hrg. Tr., Doc. No. 126 at PAGEID 3380.)  There is nothing in the record to suggest that an hour and a half time lapse between completion of booking and initial interrogation is in any way out of the ordinary in multiple murder cases, and Turner does not contend otherwise.  However, he does encourage this Court to view that lapse in time as evidence of the interrogating officers' recognition of his "extreme intoxication" as if there were no other explanation for the slight delay in beginning his interrogation.  Without *evidence* that that was the case, this Court cannot do so.

Turner also repeatedly suggests that his having been "pulled from the underbrush"

near the crime scene and the finding of a half-empty bottle of alcohol nearby should have caused his trial counsel to more thoroughly investigate his intoxication at the time of the murders. (Petition, Doc. No. 20 at PAGEID 608-9; Traverse, Doc. No. 32 at PAGEID 1075-76; Post-Evid. Hrg. Brief, Doc. No. 126 at 3380.) Neither of those facts are particularly indicative of Turner's claimed "extreme intoxication," however. Being "pulled from the underbrush" after a double murder is not categorically indicative of intoxication. In addition, the investigative report that documents the finding of the half-empty bottle of alcohol near where Turner was found after the murders contains no mention of the volume of the bottle, so the amount of liquor that might have been consumed from it by Turner is unknown. In his statement to police, Turner said he had been eating and drinking alcohol in the vicinity of Jennifer's apartment, then crawled into the woods and went to sleep (Appendix, Vol. 5 at 174), but there is no evidence to indicate that Turner drank from the bottle of alcohol prior to the murders, assuming the bottle found was Turner's.

Even if one were to accept that the evidence Turner cites might have been indicative of extreme intoxication, Turner himself alternated between claiming to have been drunk and passed out or asleep, and denying being very inebriated in his statement to police as the following exchanges between Turner and his interrogators demonstrate:

> Turner:     I was drunk and passed out. . . . I just went there and laid down.
> . . .
> Finkes:     You say you stayed there and had a couple

|           | drinks? |
|-----------|---------|
| Turner:   | Yeah. |
| . . .     | |
| Turner:   | I was like oh shit I hope I don't get arrested for drunk in public. |
| . . .     | |
| Finkes:   | And then you just laid down and went to sleep? |
| Turner:   | Yeah. |
| . . .     | |
| Turner:   | Yeah, but I went in there and laid down and went to sleep. |
| . . .     | |
| Turner:   | Yea[h], I drink but, I got here tonight. . . .  I was aware of what I was doing. |
| . . .     | |
| Turner:   | I went don't [sic] there I drunk some liquor.  I got me something to eat and laid down and went to sleep. |
| . . .     | |
| Turner:   | I ain't that drunk and I haven't been that drunk in a long while. . . .  I have a little buzz but. |
| . . .     | |
| Turner:   | I stopped by the Taco Bell and got something to eat and sat down.  (Inaudible) eat my food and take a couple of drinks of liquor.  I got back up and started out (inaudible) I am going to lay down.  Take me a little nap.  (Inaudible) I was drunk. |
| . . .     | |
| Early:    | It puts you down there in a place where you claim from when you were drinking and when you were sleeping you couldn't remember anything. |
| Turner:   | No I remember. I wasn't that drunk. |
| . . .     | |
| Finkes:   | So you didn't drink enough to blank tonight or nothing? |

Turner:        No.

(Appendix, Vol. 5 at 149, 151-52, 165, 174-75, 178, 182, 184, 185-86.)  But for one reference

to having "passed out," which he later recants, Turner's own words indicate that he was

not "extremely intoxicated" the night of the murders.

The Ohio Supreme Court has repeatedly recognized that voluntary intoxication is

entitled to little weight in mitigation.  *State v. Fitzpatrick*, 102 Ohio St. 3d 321, 338-39, 810

N.E.2d 927 (2004); *State v. Brown*, 100 Ohio St. 3d 51, 65, 796 N.E.2d 506 (2003); *State v.

White*, 82 Ohio St. 3d 16, 28, 693 N.E.2d 772 (1998); *State v. Moore*, 81 Ohio St. 3d 22, 37, 689

N.E.2d 1 (1998); *State v. Dennis*, 79 Ohio St. 3d 421, 439, 683 N.E.2d 1096 (1997); *State v.

D'Ambrosio*, 73 Ohio St. 3d 141, 145, 652 N.E.2d 710 (1995); *State v. Carter*, 72 Ohio St. 3d 545,

561-62, 651 N.E.2d 965 (1995).   Furthermore, the Sixth Circuit Court of Appeals has

explained Ohio's law respecting voluntary intoxication at the time of an offense as follows:

> In Ohio, evidence of voluntary intoxication "may be
> considered in determining whether an act was done
> intentionally or with deliberation or premeditation."  *Ohio v.
> Fox*, 68 Ohio St. 2d 53, 428 N.E.2d 410, 412 (1981).   Thus,
> establishing that a defendant was intoxicated when he
> committed the crime in question is not, in and of itself, helpful;
> the evidence must also lead the factfinder to an inference that
> intoxication deprived the defendant of the ability to form
> intent.

*Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000).  Turner's intent to murder Jennifer and

Seggerman, however, was overwhelmingly established by the facts supporting his guilty

plea, facts to which he stipulated.  (Trial Tr. at 23-37.)

Finally, Turner does not identify any evidence his trial counsel would have uncovered that was not presented in the mitigation phase of his trial, and which would have actually demonstrated his alleged "extreme intoxication" sufficiently to undermine the reliability of the stipulated facts establishing his intent to kill.  For instance, he did not present any witness at his evidentiary hearing who had personal knowledge of his alcohol intake in the hours prior to the murders, nor has he provided any affidavit or deposition of any person who had such knowledge.  Instead, all the witnesses were able to do is testify to what Turner had told him about his alcohol consumption, which was contradicted by his statements to police at the time of his arrest.  Thus, he has failed to show that the investigation he argues his trial counsel should have undertaken would have yielded any admissible evidence to establish his "extreme intoxication."  As such, even if this Court were to assume that counsel's failure to investigate Turner's intoxication at the time of the murders was deficient performance, Turner has not demonstrated prejudice therefrom as required under *Strickland*.

For all of the reasons above, Turner's seventh sub-claim of his ninth ground for relief should be denied.

### Eighth Sub-Claim - Failure to Obtain a Drug/Alcohol Dependence Expert

Next, Turner contends that a substance abuse expert, had trial counsel presented

one, would have testified that Turner was drug and alcohol dependent, and would have provided crucial testimony establishing a causal link between that dependence and Turner's commission of the aggravated murders.  (Petition, Doc. No. 20 at 612-18.) Respondent acknowledges the claim is preserved for habeas review but argues that it is unavailing.  (Return of Writ, Doc. No. 25 at 811, 832-37.)

As contended by Respondent, Turner presented the instant sub-claim to the state court as his twelfth claim in his petition for post-conviction relief.  (Appendix, Vol. 5 at 53-55.)  The state trial court dismissed the claim, stating that Dr. Haskins' meetings with Turner, administration of tests, review of records, and subsequent testimony on Turner's difficulties with alcohol and drugs constituted "ample expert discussion" of Turner's alcoholism as it related to his commission of the aggravated murders.  (Appendix, Vol. 5 at 381-82.)  The court concluded that Turner had failed to show there was a reasonable probability that the outcome of his penalty hearing would have been different had a substance abuse expert been obtained.  *Id*.  The state court of appeals affirmed, finding as follows:

> In his twelfth claim for relief, appellant argued that his expert witness was not qualified to provide expert testimony regarding substance dependence. . . .  Dr. Haskins visited with appellant for more than 16 hours and testified that appellant was drug dependent and an alcoholic.  Appellant claimed that Dr. Haskins did not have expertise in the diagnosis of alcohol dependency and presented an affidavit from Dr. Robert Smith, who appellant claimed is an expert on substance dependence.

Dr. Smith opined in his affidavit that appellant's history of substance dependence directly contributed to the commission of the murders. However, as previously noted, a post-conviction claim does not demonstrate ineffective assistance of counsel merely because it presents a new expert opinion that is different from the theory used at trial. While Dr. Smith may have stronger qualifications than Dr. Haskins, Dr. Haskins was well-qualified [sic] to discuss substance abuse issues and placed appellant's drug and alcohol dependency before the panel for its consideration. For more than ten years, Dr. Haskins worked for NetCare, evaluating adults for drug dependency. She also has evaluated criminal defendants for mitigation hearings since 1985. Although appellant did present evidence outside the record [in these post-conviction proceedings], that evidence did not demonstrate that counsel was [sic] deficient for calling Dr. Haskins as an expert witness. Therefore the trial court did not err by dismissing appellant's twelfth claim for relief without a hearing.

*Turner*, 2006 WL 391820 at *9, 2006-Ohio-761 at ¶ 35 (internal citation omitted). Further appeal to the Ohio Supreme Court was not allowed. *Turner*, 110 Ohio St. 3d 1439, 2006-Ohio-3862. Since the court of appeals addressed Turner's claim on its merits, it is preserved for federal habeas review.

Here, Turner does not explain how the state court of appeals' decision was contrary to or an unreasonable application of federal law or based on an unreasonable determination of the facts, and instead basically repeats the arguments he made to the state court. (Petition, Doc. No. 20 at PAGEID 612-18; Traverse, Doc. No. 32 at PAGEID 1077-84; Post-Evid. Hrg. Brief, Doc. No. 126 at PAGEID 3382-85.) Thus he has failed to meet his burden under the AEDPA. 28 U.S.C. § 2254(d). His claim, were it properly made, would

be without merit in any case.

In arguing his claim before the state court and this Court, Turner relies upon some unfavorable testimony elicited from Dr. Haskins at trial, and Dr. Smith's post-conviction affidavit and testimony in the evidentiary hearing in these habeas proceedings in arguing that his counsel should have obtained an expert in substance abuse to testify about the causative link between Turner's alcoholism and his commission of the aggravated murders. He contends that Dr. Smith's testimony at trial would have resulted in greater weight being given to Turner's alcoholism by the panel because Dr. Smith specializes in substance abuse and could better establish that link.  Turner blames Dr. Haskins' acknowledgment that Turner lies, has a "poor me" attitude, and has a tendency to exaggerate, along with her reliance on Turner's self-report of his alcohol consumption for the panel's assignment of little weight to his alcoholism as a mitigating factor.[8]  Nowhere does he contend any part of Dr. Haskins' testimony was inaccurate, however, and Dr. Smith's testimony before this Court, even if we were able to consider it after *Cullen, supra*, does not contradict those unfavorable parts of Dr. Haskins' testimony in any way.  Instead, Turner simply argues that Dr. Haskins' testimony prejudiced him and caused the panel to discount Turner's alcoholism as a mitigating factor.

---

[8]Turner also makes the factually erroneous argument that Dr. Haskins did not diagnose Turner as drug and alcohol dependent.  (Petition, Doc. No. 20 at PAGEID 613; Traverse, Doc. No. 32 at PAGEID 1079.)  In fact, Dr. Haskins did testify that her Primary Axis I diagnoses were alcohol dependence and cocaine dependence.  (Trial Tr., Vol. 2 at 145.)

In *Reynolds v. Bagley*, 498 F.3d 549 (6th Cir. 2007), the court considered the habeas claim that failure to produce *any* expert testimony about a defendant's chronic alcoholism constituted ineffective assistance.  498 F.3d at 557.  The court recognized that counsel's decision to present only "generic" information about the defendant's alcoholism was "questionable," but it could not conclude the state court's finding that the defendant suffered no prejudice from the omission of expert testimony was unreasonable.  *Id.* Similarly, the court has also rejected a claim that a petitioner's counsel were deficient "for not having retained the 'proper' expert to testify to his alcoholism and its causal connection to the murder he committed."  *Reynolds*, 498 F.3d at 558, *citing Nields v. Bradshaw*, 482 F.3d 442, 455-57 (6th Cir. 2007).  Turner fails to distinguish his claim from those rejected by the Sixth Circuit in *Reynolds* and *Nields*, and this Court can discern no facts in the record that do so.  Accordingly, Turner's his eighth sub-claim of his ninth ground for relief should be denied.

**Ninth Sub-Claim - Failure to Present Evidence of Remorse**

In his ninth sub-claim, Turner contends that Dr. Haskins' acknowledgment that Turner lies and exaggerates eviscerated his assertions of remorse and acceptance of responsibility in his unsworn statement which immediately preceded Dr. Haskins' testimony.  (Petition, Doc. No. 20 at PAGEID 618-22.)  Respondent argues the claim is both procedurally defaulted (Return of Writ, Doc. No. 32 at PAGEID 811-12), and meritless, *id*.

at PAGEID 832-37.  Turner contends that his presentation of the claim to the state court in his post-conviction proceedings and his application to reopen his direct appeal properly preserved the matter for habeas corpus review, and that the state court's reliance on the doctrine of *res judicata* in rejecting his claim was misplaced.  (Traverse, Doc. No. 32 at PAGEID 1056-1060.)

Respondent correctly notes that Turner presented the instant sub-claim to the state court as his thirteenth claim for relief in his post-conviction petition.  (Appendix, Vol. 5 at 56-57.)  In support, he submitted the sentencing opinion of the three-judge panel that sentenced him to death (evidence unquestionably *not* outside the record), and his medical and mental health records from the Franklin County Jail where he was held awaiting trial.  (Appendix, Vol. 5 at 95-114, Vol. 6 at 147-319.)  After the trial court dismissed his claim (Appendix, Vol. 8 at 381-2), the state court of appeals denied Turner's claimed error, reasoning as follows:

> Appellant contends in his thirteenth claim for relief that counsel was [sic] ineffective for eliciting testimony from Dr. Haskins that appellant had a history of lying and exaggerating. In support, appellant presents evidence outside the record in the form of his medical and mental health records from the Franklin County Jail.  This evidence, even though it is outside the record, does not demonstrate that he could not have appealed this claim based upon the information in the trial record. . . .  The alleged instance of ineffectiveness occurred on the record at appellant's mitigation hearing.  Therefore, this claim could have been asserted in his direct appeal. Accordingly, res judicata bars this claim and the trial court did

> not err by dismissing appellant's thirteenth claim for relief
> without a hearing.

*Turner*, 2006 WL 391820 at *10, 2006-Ohio-761 at ¶ 36. Further appeal to the Ohio Supreme

Court was not allowed. *Turner*, 110 Ohio St. 3d 1439, 2006-Ohio-3862.

In order to avoid the procedural bar that results from the state court's reliance on

an independent and adequate state procedural rule such as Ohio's doctrine of *res judicata*,

Turner must demonstrate cause and prejudice for the default. *Maupin*, 785 F.2d at 138.

Turner argues that since he included evidence outside the record when he presented the

claim to the state post-conviction court, the state court of appeals misapplied the doctrine

of *res judicata* to his claim. (Traverse, Doc. No. 32 at 1057-58.) But Turner misses the critical

point that not only must there be evidence outside the record submitted, but it must be

*relied upon by the court* for the petitioner's claim to warrant relief. The state court of appeals

determined that Turner's claim could have been resolved without resort to evidence

outside the record, and Turner takes no issue with that determination. Instead, he protests

that the mere *submission* of evidence from outside the record should negate the state court's

reliance on its doctrine of *res judicata*. It does not, and thus Turner's argument fails to

provide an excuse for his procedural default of his ninth sub-claim.

Turner also attempts to avoid the procedural bar by arguing that the instant claim

was preserved because he raised it as a claim underlying his ineffective assistance of

appellate counsel claim in his application to reopen his direct appeal. (Traverse, Doc. No.

32 at 1058-1060.)  For habeas corpus purposes, however, raising appellate counsel's ineffectiveness in an application to reopen a direct appeal preserves only the ineffective assistance of appellate counsel claim , not the underlying claims.  *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008); *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005).  Thus, Turner's inclusion of the instant claim as one underlying his ineffective assistance of appellate counsel claim in the state court does not preserve this claim for habeas review.  In addition, since his ineffective assistance of appellate counsel claim is without merit (*see* Turner's thirteenth ground for relief, *infra*), it cannot serve as cause for his default of the underlying claims, including the one asserted here.  *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000), *citing Murray v. Carrier*, 477 U.S. 478, 488-89 (1986).  Turner's arguments contesting Respondent's defense of procedural default are unavailing.  Accordingly, his ninth sub-claim of his ninth ground for relief should be denied as procedurally defaulted.

Even if that were not the case, however, Turner's claim is meritless as well.  While the medical and mental health records submitted in support of his claim might contain some indication of Turner's remorse for murdering two people, they do nothing to refute Dr. Haskins' testimony that he is prone to lying and exaggeration.  In addition, the Ohio Supreme Court has observed that "[r]emorse . . . deserves little weight in mitigation," in death penalty cases, and the court has acknowledged that it has upheld previous death sentences in which evidence of the defendant's remorse was present.  *State v. Otte*, 74 Ohio

St. 3d 555, 568-69, 660 N.E.2d 711 (1996).  Finally, the panel's sentencing opinion accorded

Turner's expression of remorse some weight in mitigation stating as follows:

> The defendant expressed remorse for having killed two people.
> Dr. Haskins testified that she believes the remorse is probably
> genuine although more heavily weighted for Mr. Seggerman
> as opposed to Jennifer Turner who [sic] he had planned to kill
> over a period of weeks.  The panel finds remorse to be
> established as a mitigating factor and accords it some weight.

(Appendix, Vol. 3 at 17-18.)  Thus, it appears that Dr. Haskins' testimony induced the panel

to accord Turner's remorse some weight in mitigation rather than negating it.  In any case,

because remorse is generally given little weight in mitigation, and Turner's panel did

accord his remorse some weight, it is unlikely that absent Dr. Haskins' testimony on

Turner's tendency to lie and exaggerate the panel would have returned a lesser penalty

than death.  Consequently, even if Turner had properly preserved his claim, it would fail

on its merits.

Turner's ninth sub-claim is procedurally defaulted and meritless as well.

Accordingly, it should be denied.


**Tenth Ground for Relief**

In his tenth ground for relief, Turner contends that even if none of the previous nine

claims warrant habeas corpus relief, the cumulative effects of the errors contained therein

do.  (Petition, Doc. No. 20 at PAGEID 623-25.)  Although Respondent argues both the

procedural status and the merits of Turner's claim (Return of Writ, Doc. No. 25 at PAGEID

838-40), Turner has not raised a claim that is cognizable in habeas corpus.

> The Supreme Court has repeatedly stated that fundamentally
> unfair trials violate due process, *see, e.g., Riggins v. Nevada*, 504
> U.S. 127, 149 (1992) (quoting *Spencer v. Texas*, 385 U.S. 554, 563-
> 64 (1967)), and common sense dictates that cumulative errors
> can render trials fundamentally unfair.  Additionally, the
> Supreme Court has expressly cumulated prejudice from
> distinct errors under the Due Process Clause.  *Chambers v.
> Mississippi*, 410 U.S. 284, 298 (1973).  ("We need not decide,
> however, whether this error alone would occasion reversal
> since Chambers' claimed denial of due process rests on the
> ultimate impact of that error when viewed in conjunction with
> the trial court's refusal to permit him to call other witnesses.").
> Nonetheless, the law of this Circuit is that cumulative error
> claims are not cognizable on habeas because the Supreme
> Court has not spoken on this issue.  *See Moore v. Parker*, 425
> F.3d 250, 256 (6th Cir. 2005) (discussing cumulated evidentiary
> errors).  No matter how misguided this case law may be, it
> binds us.

*Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) (parallel citations omitted).  As the

Sixth Circuit Court of Appeals is bound, so it is with this Court.  Turner's tenth ground for

relief is not cognizable in habeas corpus, and should be denied.


**Eleventh Ground for Relief**

In his eleventh ground for relief, Turner contends his death sentence violates the

Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution for

several reasons, as well as violating "the various treaty and compact obligations of the

United States under international law."   (Petition, Doc. No. 20 at PAGEID 626-29.) Respondent argues that portions of Turner's claim are procedurally defaulted because they were never presented to the state courts, and that the entire claim is without merit. (Return of Writ, Doc. No. 25 at PAGEID 841-850.)  Turner counters that those portions of his claim Respondent alleges have been procedurally defaulted were presented to the state court as claims underlying his ineffective assistance of appellate counsel claim, and that they were thereby preserved for habeas corpus review.  (Traverse, Doc. No. 32 at PAGEID 1102-5.) Since Turner's ineffective assistance of appellate counsel claim is without merit, however, appellate counsel's performance cannot provide cause for Turner's default of any part of his eleventh ground for relief.  Moreover, the inclusion of a claim as one underlying an ineffective assistance of appellate counsel claim raised in a state application to reopen a direct appeal does not preserve the underlying claim.  Thus, to the extent Turner argues capital defense counsel are underfunded, Ohio law unconstitutionally requires submission of any presentence investigation or mental health evaluations to the finder of fact, that his death sentence constitutes cruel and unusual punishment, and that his death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments as well as principles of international law contained in unidentified charters and treaties signed by the United States government, his claim is procedurally defaulted.  Those portions of his eleventh ground for relief should consequently be denied.

The defaulted parts of Turner's claim are also meritless.  He has provided no evidence or argument demonstrating that Ohio's funding of capital defense attorneys is somehow inadequate, other than his conclusory statement that it is so.  His argument that Ohio's requirement that any presentence investigation or written mental health evaluation be conveyed to the fact finder is unconstitutional would be unavailing even if it were preserved for review.  In *Cooey v. Coyle*, 289 F.3d 882 (6th Cir. 2002), the Sixth Circuit found the claim respecting a presentence investigation report meritless, stating that "we could find no case where the Constitution has been construed as forbidding such a rule."  *Id*. at 925.  As for the "mental health evaluation" portion of Turner's claim, it fails as well.  The Ohio statute requires any report generated as a result of a mental examination conducted for mitigation purposes to be provided to the trial court, jury, and prosecutor.  *See* Ohio Rev. Code § 2929.03(D)(1).  It does not require a written report to be created, however.  Thus, a psychologist may conduct a mental health evaluation for mitigation purposes and testify to his or her findings without preparing a written report, thereby avoiding providing the report to the finder of fact.  In addition, the Supreme Court has never expressed any constitutional discomfort with the substance of the Ohio statutory provision relating to Turner's challenge.  Also, Turner states that Ohio's capital punishment scheme violates the Eighth Amendment to the United States Constitution without acknowledging longstanding Supreme Court law to the contrary.  *See Lockett v. Ohio*, 438 U.S. 586 (1978);

*Gregg v. Georgia*, 428 U.S. 153 (1976). Finally, Turner's claim that his death sentence is unconstitutional and contrary to international law and "various charters and treaties" of which the United States is a signatory is simply too vague to make out a claim entitling him to habeas corpus relief. Thus, even if the procedurally defaulted portions of his claim were preserved, they would fail.

Turner also alleges that Ohio failed to provide him with a "fair and adequate appellate review process" and that the Ohio statutory scheme permits the arbitrary and discriminatory imposition of the death penalty." (Petition, Doc. No. 20 at PAGEID 627-28.) Respondent acknowledges those parts of Turner's claim were presented in state court on direct appeal as his seventh proposition of law. (Return of Writ, Doc. No. 25 at PAGEID 841-42.) The Ohio Supreme Court summarily overruled Turner's proposition of law stating that his challenges to the constitutionality of the death penalty and Ohio's statutory scheme had been repeatedly rejected in the past. *Turner*, 105 Ohio St. 3d at 342 (citing eight cases). Contrary to Turner's assertion that the state court did not rule on the merits of his "arbitrary and discriminatory" and "international law, charters, and treaties" claims, the Ohio Supreme Court's summary consideration and rejection of the claims constituted a ruling on the merits. *Haliym v. Mitchell*, 492 F.3d 680, 691 (6th Cir. 2007), *citing Frazier v. Huffman*, 343 F.3d 7890, 799-800 (6th Cir. 2003), and *Ylst v. Nunnemaker*, 501 U.S. 797, 806-07 (1991) (White, J. concurring).

There being a merits decision from the state court, Turner's burden in these proceedings is to demonstrate how that decision is contrary to or an unreasonable application of federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). This he has not done. Instead, he cites the American Bar Association's 2007 Ohio Death Penalty Assessment Report and conclusions of the United Nations High Commission for Human Rights as authority. The AEDPA, however, allows habeas corpus relief to be granted only where the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Turner has not demonstrated how the Ohio Supreme Court's decision denying his claimed error is contrary to *those* authorities. Although he mentions treaties in his argument, he does not identify any specific treaty to aid this Court in its consideration of his claim, and as of January 1, 2010, there were literally thousands of treaties signed by the United States in force according to *Treaties in Force, A List of Treaties and Other International Agreements of the United States in Force on January 1, 2010,* a publication of the United States Department of State.[9] This Court will not guess as to which of those thousands of treaties Turner alludes in his claim.

Finally, Turner does not provide any evidence that Ohio's death penalty scheme is conducted in an arbitrary and discriminatory manner. Turner's conclusory assertion that it is so does not establish it as fact.

_____

[9]Available at http://www.state.gov/s/l/treaty/tif/index.htm, last visited on December 2, 2010.

-99-

Turner has procedurally defaulted a significant part of his eleventh ground for relief, and to that extent it should be denied.  The remainder of his claim is presented in such a bare-bones manner and is so lacking in authoritative support that he has failed to make a claim cognizable in habeas corpus.  Accordingly, the preserved parts of his eleventh ground for relief should also be denied.

**Twelfth Ground for Relief**

In his twelfth ground for relief, Turner contends that the Ohio statutory scheme providing appellate and proportionality review of his convictions and death sentence is inadequate to satisfy federal constitutional requirements. (Petition, Doc. No. 20 at PAGEID 630-634.)  Respondent argues the issue is procedurally defaulted and meritless as well. (Return of Writ, Doc. No. 25 at PAGEID 851-53.)

Respondent's procedural default argument is that Turner never presented his claim to the state court on direct appeal or in his post-conviction proceedings. (Return of Writ, Doc. No. 25 at PAGEID 851.)  Turner does not dispute the facts of Respondent's argument, but contends, as he has elsewhere, that including his claim as one underlying his ineffective assistance of counsel claim in the state court was sufficient to preserve the claim for habeas review. (Traverse, Doc. No. 32 at PAGEID 1109-12.)  As has been explained before, only the ineffective assistance of appellate counsel claim may be preserved via an application

to reopen a direct appeal in the state courts, not the underlying claims.  In addition, Turner's ineffective assistance of appellate counsel claim is meritless (*see* Thirteenth Ground for Relief), and cannot serve as cause for the default of the instant claim. Accordingly, Turner's twelfth ground for relief is procedurally defaulted without excuse and should be denied.

Even if it were preserved, however, the issues Turner raises have been repeatedly and consistently rejected by the Sixth Circuit Court of Appeals.  Turner contends that Ohio's proportionality review in which a defendant's death sentence is compared only to other cases in which a death sentence was imposed is unconstitutional. (Petition, Doc. No. 20 at PAGEID 631.)  That argument, however, is no different than the one rejected in *Buell v. Mitchell*, 274 F.3d 337, 368-69 (6th Cir. 2001), where the Sixth Circuit Court of Appeals observed that Ohio's appellate review procedures satisfy federal due process requirements, and that Ohio's proportionality review procedures are "within the wide latitude . . . allowed" in view of the fact that proportionality review is not required by the Constitution. *See also Smith v. Mitchell*, 567 F.3d 246, 261 (6th Cir. 2009); *Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003); *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000).  Thus, even if Turner's claim were preserved, it would be meritless.

**Thirteenth Ground for Relief**

In his thirteenth ground for relief, Turner contends his appellate counsel's failure to raise six propositions of law as error on direct appeal before the Ohio Supreme Court constituted ineffective assistance. (Petition, Doc. No. 20 at PAGEID 635-64.) Although the Ohio Supreme Court denied Turner's application to reopen his direct appeal because he failed to file it within the 90-day period provided for by the state rule, *State v. Turner*, 116 Ohio St. 3d 1408, 876 N.E.2d 967, 2007-Ohio-6140 (2007) (table), Respondent has not advanced a procedural default defense. (Return of Writ, Doc. No. 25 at PAGEID 854; Warden's Post Evid. Hrg. Brief, Doc. No. 129 at PAGEID 3538-40.) Instead Respondent argues that the propositions of law Turner claims his appellate counsel should have raised would have been denied, and that an attorney is not ineffective for failing to raise meritless claims on appeal. *Id.*

Turner identifies six proposed propositions of law that he argues his appellate counsel should have raised as error on direct appeal to the Ohio Supreme Court, which are as follows:

> 1. Michael Turner's statements to law enforcement officials were not based on a knowing, voluntary and intelligent waiver of his right against self-incrimination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.
>
> 2. The law enforcement officials who interrogated Turner failed to honor his clear and repeated requests for counsel and continued to interrogate him after he invoked his right to counsel in violation of the Fifth,

Sixth, Eighth, and Fourteenth Amendments to the
United States Constitution.

3.  Michael Turner was denied the effective assistance of
counsel in the innocence-guilt determination phase of
his capital trial in violation of the Fifth, Sixth, Eighth,
and Fourteenth Amendments to the United States
Constitution.

A.  Failure to ensure that Turner could withdraw his
jury waiver if the three-judge panel returned a
death verdict.

B.  Failure to ensure that Turner was fully informed
of the consequences of his jury waiver.

C.  Failure to ensure that Turner could withdraw his
guilty plea if the three-judge panel returned a
death verdict.

4.  Michael Turner was denied the effective assistance of
counsel at the penalty phase of his capital trial in
violation of the Fifth, Sixth, Eighth, and Fourteenth
Amendments to the United States Constitution.

A.  Failure to utilize readily available documentary
evidence to demonstrate Turner's extreme
intoxication at the time of the offense.

5.  Ohio has failed to provide an adequate system of
appellate and proportionality review in death penalty
cases.

6.  Michael Turner's sentence of death was obtained in
violation of the Fifth, Sixth, Eighth and Fourteenth
Amendments as well as the various treaty and compact
obligations of the United States under international law.

(Petition, Doc. No. 20 at PAGEID 635-60.)

*Strickland*'s two-pronged test applies to ineffective assistance of appellate counsel

-103-

claims just as it does to ineffective assistance of trial counsel claims.  *Smith v. Robbins*, 528

U.S. 259, 285 (2000).  A habeas petitioner must first show that his counsel were "objectively

unreasonable . . . in failing . . . to discover nonfrivolous issues and to file a merits brief

raising them."  *Id*.  Second, "he must show a reasonable probability that, but for his

counsel's unreasonable failure to file a merits brief [raising the meritorious issues], he

would have prevailed on his appeal."  *Id*.  That is not to say that appellate counsel, even in

a death penalty case, must present every nonfrivolous claim on appeal, however.  In *Jones*

*v. Barnes*, 463 U.S. 745, 751-52 (1983), the Supreme Court recognized the importance of

"winnowing out" weaker arguments to focus on the stronger claims.  *See also Evitts v.*

*Lucey*, 469 U.S. 387, 394 (1985) (stating that an attorney need not advance every argument

on direct appeal).  The Court later observed that "it is still possible to bring a *Strickland*

claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate

that counsel was incompetent."  *Smith*, 528 U.S. at 288.  "Generally, only when ignored

issues are clearly stronger than those presented, will the presumption of effective assistance

of counsel be overcome."  *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986).  Keeping these

precepts in mind, the Court will address each of Turner's proposed propositions of law he

contends his appellate counsel should have raised in the state court.

First, Turner claims his appellate counsel were ineffective because they did not raise

as error on direct appeal Turner's intoxicated condition and alcohol withdrawal when

being interrogated by police following his arrest which rendered his statements unknowing and involuntary.  (Petition, Doc. No. 20 at PAGEID 636-40.)  As noted in this Court's consideration of Turner's first ground for relief, that claim would have had little chance of success before the Ohio court because later, when Turner was not intoxicated or suffering from the effects of alcohol withdrawal, he stipulated to facts sufficient to support his convictions and death sentence.  There is no duty for appellate counsel to raise plainly meritless claims, and Turner's challenge to the voluntariness of his statements to police is certainly no "dead bang" winner.  *See McMeans v. Brigano*, 228 F.3d 674, 681-82 (6th Cir. 2000); *United States v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995).  On the contrary, this Court cannot conceive of that claim succeeding given Turner's guilty pleas which were entered when he was not intoxicated.  Consequently, his appellate counsel were not ineffective in deciding not to raise the first proposed proposition of law on direct appeal.

Second, Turner argues his appellate counsel should have raised as error on appeal the police officers' refusal to honor his request for counsel during his interrogation. (Petition, Doc. No. 20 at PAGEID 640-43.)  The Sixth Circuit Court of Appeals has summarized the relevant law as follows:

> As the Supreme Court noted in *Miranda* [*v. Arizona*], "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege."  384 U.S. [436,] 469 [(1966)].  If at any time during an interview a suspect requests counsel, "he is not subject to further questioning until a lawyer has been made available or the suspect himself

> reinitiates conversation." *Davis* [*v. United States*], 512 U.S. [452,
> ]458 [(1994)] (citing *Edwards* [*v. Arizona*], 451 U.S. [477,] 484-85
> [(1981)].  A suspect need not "speak with the discrimination of
> an Oxford don," but must be unambiguous.  [*Davis*, 512 U.S.]
> at 459.  This means that a suspect "must articulate his desire to
> have counsel present sufficiently clearly that a reasonable
> police officer in the circumstances would understand the
> statement to be a request for an attorney."  *Id*.

*Tolliver v. Sheets*, 594 F.3d 900, 922 (6th Cir. 2010) (parallel citations omitted).  "But if a

suspect makes a reference to an attorney that is ambiguous or equivocal in that a

reasonable police officer in light of the circumstances would have understood only that the

suspect *might* be invoking the right to counsel, our precedents do not require the cessation

of questioning."  *Davis*, 512 U.S. at 459.

Turner claims his repeated requests for counsel were ignored by the police officers

who interrogated him.  (Petition, Doc. No. 20 at PAGEID 640-43.)  Several of Turner's

comments respecting an attorney were equivocal or ambiguous and did not clearly express

a desire to invoke his right to counsel:  "Anything I say I am going to get me a lawyer,"

(Appendix, Vol. 5 at 181); "I would like to have a lawyer help me with this," *id*. at 208; and

"If I had an attorney here that I could talk to and see what he said . . .," *id*. at 212.  Those

statements are not unlike other suspects' statements found to have been insufficient to

invoke the right to counsel.  *Davis*, 512 U.S. at 462, ("Maybe I should talk to a lawyer.");

*Clark v. Murphy*, 331 F.3d 1062, 1069-72 (9th Cir. 2003), ("I think I would like to talk to a

lawyer."); *United States v. Zamora*, 222 F.3d 756, 765-66 (10th Cir. 2000), ("I might want to

talk to an attorney."); *Burket v. Angelone*, 208  F.3d 172, 198 (4th Cir. 2000), ("I think I need

a lawyer."); *Mueller v. Angelone*, 181 F.3d 557, 573-74 (4th Cir. 1999), ("Do you think I need

an attorney here?"); *United States v. Posada-Rios*, 158 F.3d 832, 867 (5th Cir. 1998), (I "might

want to get a lawyer then, huh?"); *Diaz v. Senkowski*, 76 F.3d 61, 63-65 (2d Cir. 1996), ("I

think I want a lawyer. . . .  Do you think I need a lawyer?"); *Ledbetter v. Edwards*, 35 F.3d

1062, 1067, 1069-70 (6th Cir. 1994) ("'It would be nice' to have an attorney.); *Lord v.

Duckworth*, 29 F.3d 1216, 1218-21 (7th Cir. 1994), ("I can't afford a lawyer but is there anyway

[sic]I can get one?").

Turner made three statements which come closer to the level of clarity necessary to

invoke his right to counsel:  "Can I call my lawyer?" (Appendix, Vol. 5 at 206); "I need to

talk to an attorney," *id*. at 210; and "I think I need to talk to an attorney," *id*.[10]  But while

those statements may be less equivocal than Turner's other comments referring to an

attorney, even if they were sufficient to invoke the right to counsel, any error from the

police officers' failure to respect Turner's request for counsel was harmless.

In *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993), the Supreme Court explained a

federal court's duty with regard to harmless-error review as follows:

> Consistent with the jury-trial guarantee, the question . . . the
> reviewing court [is] to consider is not what effect the
> constitutional error might generally be expected to have upon

---

[10]It should be noted that the police officers provided Turner with a phone with which to call a lawyer, but that it appears Turner chose not to do so when he realized it was approximately 2:50am.  (Appendix, Vol. 5 at 206-9.)

a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand.  Harmless-error review looks, we have said, to the basis on which "the jury *actually rested* its verdict."  The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered – no matter how inescapable the findings to support that verdict might be – would violate the jury-trial guarantee.

*Id.*, *quoting Yates v. Evatt*, 500 U.S. 391, 404 (1991)(citations omitted).  Likewise, in *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), the Court observed that "[t]he standard for determining whether habeas relief must be granted is whether the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict,'" *quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946).  Finally, the Supreme Court has held that the *Brecht* standard governs a federal court's harmless-error review in habeas corpus cases.  *Fry v. Pliler*, 551 U.S. 112, 119-20 (2007).  Thus, in evaluating Turner's claim to determine whether the asserted error was harmless, this Court simply answers whether Turner has shown that the alleged error had a substantial and injurious effect in determining the three-judge panel's verdict.  *See Wilson v. Mitchell*, 498 F.3d 491, 503 (2007).

The answer to that question must be "no" because Turner pled guilty to all charges in the indictment, and because the effect of any statements Turner made to police after "requesting" an attorney is diluted to the point of insignificance by the overwhelming

-108-

evidence of his guilt for the planned, purposeful killing of Jennifer and Seggerman. Consequently, his statements during interrogation did not have a "substantial and injurious" effect on the three-judge panel's verdicts in Turner's case. It follows that because the claim would have failed had it been raised as error on direct appeal, Turner's appellate counsel's representation was not rendered deficient by their decision not to raise the losing claim.

Third, Turner argues his appellate counsel should have raised trial counsel's ineffectiveness in the guilt phase of his trial as error in the state court, and that their failure to do so constituted ineffective assistance. (Petition, Doc. No. 20 at PAGEID 643-55, 651-55.[11]) This Court addressed the merits of the underlying ineffective assistance of trial counsel claim under Turner's third and fifth sub-claim of his sixth ground for relief, *supra*, and found them unavailing. In short, the alleged practice of Franklin County to allow withdrawal of a guilty plea in the event that a death sentence is returned by a three-judge panel was nothing more than rumor according to Franklin County prosecutors Christian Domis and Edward Morgan. (Evid. Hrg. Tr. at 394-5, 427.) In addition, the lead prosecutor in Turner's case specifically testified that he would not have approved such an arrangement even if it had been Franklin County's practice in other cases. *Id*. at 427. Even if trial counsel had requested an agreement that Turner be allowed to withdraw his guilty

---

[11]Turner raises the withdrawal-of-guilty-plea matter in two separate sub-headings under his proposed third proposition of law. They are addressed together here.

plea should a death verdict be returned by the panel, the request would have been denied by the prosecutors. Trial counsel's failure to do so was consequently not ineffective assistance, but rather a proper exercise of judgment. Since trial counsel were not ineffective, appellate counsel's representation was not deficient for lack of raising trial counsel's ineffectiveness as error on direct appeal.

Turner also argues that his appellate counsel should have raised as error on direct appeal trial counsel's ineffectiveness for failing to fully inform Turner of the consequences of his guilty plea. (Petition, Doc. No. 20 at PAGEID 648-51.) In Turner's sixth ground for relief, *supra*, this Court determined that Turner had failed to demonstrate that his trial counsel had neglected to adequately inform him of the consequences of his waiver of a jury trial. The record demonstrates that Turner knowingly, voluntarily, and intelligently waived his right to a jury trial, and his trial counsel testified at the evidentiary hearing in these proceedings that he was sure he had fully explained the consequences of Turner's decision to him. (Trial Tr., Vol. 1 at 64; Evid. Hrg. Tr. at 117.) There being no deficiency on the part of his trial counsel respecting his waiver, there can be no ineffectiveness attributed to his appellate counsel for not raising trial counsel's alleged ineffectiveness as error on direct appeal.

Each of Turner's assertions that his appellate counsel were ineffective for failing to raise trial counsel's ineffectiveness in the guilt phase of his trial as error on direct appeal

has been considered individually and cumulatively. Each proposition is exceedingly weak alone, and even together they possess no merit. Neither error nor prejudice has been demonstrated respecting Turner's appellate counsel's performance on direct appeal.

Fourth, Turner argues his appellate counsel provided deficient representation when they did not raise as error on direct appeal trial counsel's ineffectiveness in the mitigation phase of his trial for (1) failing to challenge the evidence supporting the aggravating circumstances, (2) presenting inadequate mitigating evidence, and (3) omitting readily available evidence of Turner's "extreme intoxication" at the time of the murders. (Petition, Doc. No. 20 at PAGEID 655-60.) All three contentions can be disposed of immediately: the first because appellate counsel did present the allegedly omitted claim to the state court on direct appeal (Appendix, Vol. 3 at 74-76), and the second and third because those claims, by their very nature, would have required appellate counsel to demonstrate prejudice from the alleged omissions, which could not be accomplished without reference to the omitted evidence. As noted above, the Ohio Supreme Court is confined to the trial court record when evaluating claimed errors on direct appeal. Appellate counsel were not ineffective for omitting any of the three claims Turner advances in his fourth proposed proposition of law.

Fifth, Turner, argues that his appellate counsel should have raised as error on direct appeal Ohio's failure to provide for adequate appellate and proportionality review in death

penalty cases.  (Petition, Doc. No. 20 at PAGEID 660-61.)  As observed in this Court's discussion of Turner's twelfth ground for relief, *supra*, arguments that Ohio's statutory scheme for appellate review of death sentences have been repeatedly and consistently rejected by the Sixth Circuit Court of Appeals.  The question here, however, is different. When the claim is one of ineffective assistance of appellate counsel, and the appellate and proportionality review issues are merely ones that underlie the claim of ineffectiveness, the question becomes whether the underlying claim would have had a reasonable probability of success in the state court had the petitioner's appellate counsel raised the error on direct appeal.  Thus, the underlying claim does not necessarily have to concern a violation of the federal constitution.  If appellate counsel omitted a meritorious claim from the habeas petitioner's direct appeal in the state court, even if the underlying claim concerns only state law, appellate counsel's ineffectiveness is established and it is that constitutional error which is cognizable in federal habeas corpus.

That said, the claim underlying Turner's ineffective assistance of appellate counsel claim has never succeeded in the Ohio Supreme Court when it has been presented in other cases.  *See, e.g., State v. LaMar*, 95 Ohio St. 3d 181, 186, 767 N.E.2d 166, 2002-Ohio-2128 (2002) (characterizing challenges to Ohio's statutory scheme of appellate and proportionality review as "settled issues" and summarily rejecting them with citation to cases in which similar propositions of law were overruled).  Consequently, there is no

reason to believe that Turner's claim would have succeeded where so many others have failed. Turner's appellate counsel's decision not to present a claim on direct appeal that has been repeatedly rejected by the Ohio Supreme Court was again an exercise of sound judgment rather than deficient performance.

Sixth, Turner contends his appellate counsel were ineffective because they failed to challenge his death sentence on international law and treaty grounds. Such arguments are routinely rejected by the Ohio Supreme Court. *See, e.g., State v. Fry*, 125 Ohio St. 3d 163, 199, 926 N.E.2d 1239, 2010-Ohio-1017 (2010) (characterizing similar challenges to Ohio's death penalty scheme as "settled issues," citing cases in which the claims have been rejected as meritless). Ineffectiveness of Turner's counsel is not demonstrated by their failure to present a plainly meritless claim to the Ohio Supreme Court on direct appeal.

Each of Turner's proposed propositions of law have been evaluated and found to be lacking merit. As there is no error or prejudice to cumulate, Turner has failed to demonstrate entitlement to habeas corpus relief based upon his appellate counsel's ineffectiveness. Accordingly, his thirteenth ground for relief should be denied.

**Fourteenth Ground for Relief**

In his fourteenth and final ground for relief, Turner contends Ohio's post-conviction procedure is constitutionally flawed because it does not allow a petitioner adequate

-113-

discovery or expert and investigative assistance with which to pursue his federal constitutional claims in the state court.   (Petition, Doc. No. 20 at PAGEID 665-68.) Respondent argues the claim is procedurally defaulted because it was never presented to the Ohio court.  (Return of Writ, Doc. No. 25 at PAGEID 858.)  In addition, Respondent cites *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001), for the proposition that "[i]t is well-settled [sic] that habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction relief," (Return of Writ, Doc. No. 25 at PAGEID 859), and that Turner's claim is without merit as a consequence.  Turner counters that Respondent's procedural defense is nothing more than "conclusory statements" and thus inadequate to demonstrate entitlement to the defense.  (Traverse, Doc. No. 32 at PAGEID 1133.)

The Sixth Circuit Court of Appeals has surveyed the law governing Turner's claim as follows:

> [T]he Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review. See *Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986); *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002).  We have clearly held that claims challenging state collateral post-conviction proceedings "cannot be brought under the federal habeas corpus provision. . ." because "'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.'"  *Kirby*, 794 F.2d at 246 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973)); see also *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987) . . . .  A due process claim related to collateral post-conviction proceedings, even if resolved in a petitioner's favor, would not "result [in] .

-114-

. . release or a reduction in . . . time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention." *Kirby*, 794 F.2d at 247. "Though the *ultimate* goal in" a case alleging post-conviction error "is release from confinement, the result of habeas review of the specific issue[] . . . is not in any way related to the confinement." *Id*. at 248. Accordingly, we have held repeatedly that "the scope of the writ [does not] reach this second tier of complaints about deficiencies in state post-conviction proceedings," noting that "the writ is not the proper means" to challenge "collateral matters" as opposed to "the underlying state conviction giving rise to the prisoner's incarceration." *Id*. at 248, 247; see also *Alley v. Bell*, 307 F.3d 380, 387 (6th Cir. 2002) ("error committed during state post-conviction proceedings can not [sic] provide a basis for federal habeas relief" (citing *Kirby*, 794 F.2d at 247)); *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) ("habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction relief").

*Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (parallel citations omitted). Therefore, Turner's fourteenth ground for relief does not present an issue cognizable in federal habeas corpus proceedings, and it should be denied.

## CONCLUSION

The Court has considered each of Turner's grounds for relief individually as well as cumulatively and found them meritless.  Accordingly, his petition for a writ of habeas corpus should be denied.

April 22, 2011.

s/ **Michael R. Merz**
United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

J:\Death Penalty\Turner v. Hudson\Turner Filed R&R.wpd